(49 South. 719.)

No. 17,388.

WOODWARD-WIGHT & CO., Limited, v. ENGEL LAND & LUMBER CO.

(June 7, 1909.)

1. SALES (§ 166*)—SALE OF MACHINERY—DUTY TO REMEDY DEFECTS.

Where machinery, purchased for particular use, is so defective in design or construction, or both, as to be incapable of rendering the service contemplated by the contract, the obligation rests upon the vendor to ascertain the nature of the defects and to cure them.

[Ed. Note.—For other cases, see Sales, Cent. Dig. § 394; Dec. Dig. § 166.*]

2. PRESCRIPTION — RECONVENTIONAL DEMAND —IGNORANCE OF GROUNDS OF ACTION.

In a case where machinery has been sold which proves to be defective in design or construction, but the exact nature of the defects in which is a matter of dispute, determinable only by expert opinion, and where the vendor, after repeated efforts, abandons the attempt to cure such defects, the prescription of the action, brought by way of reconventional demand, to avoid the contract and recover the portion of the price paid, begins to run only when the vendee discovers that such defects are redhibitory and the vendor abandons his attempt to cure them.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. § 473; Dec. Dig. § 95.*]

3. APPEAL AND ERROR (§ 173*) — PRESENTATION AND RESERVATION OF GROUNDS OF REVIEW—QUESTIONS NOT RAISED BELOW.

Where a vendor of machinery sues upon notes given for a balance due on the contract price and is met by a demand, in reconvention, for the avoidance of the contract and the repetition of the amount already paid, upon the ground that the machinery proved to be defective, such demand will not be dismissed, upon an objection, urged for the first time in this court, that no tender has been made of the machinery; but the rights of the plaintiff, with respect to its return, as a condition precedent to the execution of the judgment for the repetition of the price, will be protected.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 1085; Dec. Dig. § 173.*]

(Syllabus by the Court.)

Appeal from Ninth Judicial District Court, Parish of Madison; Francis Xavier Ransdell, Judge.

Action by Woodward-Wight & Co., Limited, against the Engel Land & Lumber Company. Judgment for defendant, and plaintiff appeals. Amended, and as amended affirmed.

E. C. Montgomery, Theodore Roehl, and Rouse, Grant & Grant, for appellant. Snyder & Gilfoil and Mark Mayo Boatner, for appellee.

Statement of the Case.

MONROE, J. This was begun as an ordinary action, upon two promissory notes, each for $2,000, given by the Engel Land & Lumber Company for the balance due upon the price ($10,000) of two "skidder" outfits, which that company had bought from the plaintiff company. By various supplemental petitions, George P. Hummer, indorser of the notes sued on, was made defendant, an attack was made upon a mortgage which the defendant company had imposed upon its property, in favor of Hummer, and a writ of attachment was prayed for and ob-

tained. Defendants interposed various exceptions and motions, some of which were disposed of and some referred to the merits, after which they set up the defense that there was a failure of consideration, in that the "skidders" proved to be faulty in design, or construction, and could not be made to do the work contemplated in their sale and purchase; and the lumber company, alleging that it thereby sustained serious loss, and assuming the position of plaintiff in reconvention, prayed judgment for damages, as, also, for the sum of $6,000, being the portion of the purchase price of the skidders, already paid. To the claim for damages thus set up, plaintiff (in the main action) pleaded the prescription of one year, and otherwise (in this court, for the first time, apparently) urges the objection that defendant has made no offer to return the skidders.

The questions presented by the exceptions and motions to which we have referred have been practically merged in that raised by the defense on the merits and by the demand in reconvention. The facts, as we find them from the evidence before us, are as follows:

The defendant company, having acquired a large body of timbered land in the parish of Madison, and having established thereon a sawmill and a logging railroad, some 7 miles long, on March 22, 1906, entered into a contract with the plaintiff company whereby the latter agreed, for $10,000, to furnish, "f. o. b., New York, at earliest possible time," "two slack rope skidders complete with fittings"; the material and construction of the same being guaranteed. A skidder, "complete with fittings," it appears, is a machine intended for use in the pulling of sawlogs from the places, in woods or swamps, where the trees fall, to more accessible places, and there loading them on logging trains or otherwise handling them; and, for the purpose of the contract in question, each

skidder consisted of two engines, with 9x10-inch cylinders, the one, equipped with a revolving drum and wire rope, to pull logs to the railroad, and the other to load them on the cars. Defendant's foreman had used skidder engines of the "Lidgerwood" make, with 10x10-inch cylinders, and defendants, guided by his advice, would probably have bought engines of that kind; but plaintiff's representative urged the purchase of engines with 9x10-inch cylinders. He told them "that this machine that he had for sale, at that time, was a new type of machine that they were getting out for the Pacific Coast (in fact, he called it the Pacific Coast type), and that it had a larger pulling gearing, which would give it practically more strength than a 10x10," etc.; and it was therefore agreed that the engines should be of the new, "Pacific Coast type" with 9x10-inch cylinders. One of the skidders, "complete," reached defendant about the last of May or first of June, 1906, and defendant appears to have written a letter requesting that the shipment of the other be delayed until it (the one received) could be tested. The letter is not in the record; but the answer, dated June 4th, reads, in part, as follows, to wit:

"We are in receipt of a letter from your Grand Rapids office, in which they ask us to delay the shipment of the second machine in order that you may have a chance to test the first machine before the second is shipped. We beg to call your attention to the fact that you have purchased from us two machines, complete, and, if you will note your contract, you will find that the shipment of these machines was to have been made at the earliest date. We placed your order for these machines with the Lidgerwood Company, New York, and the same are built especially to fit your conditions. * * * We understand that the first machine was shipped to you last week and that the second will go forward some time this week. The writer expects to visit your place when you have the machines in operation and feels sure that these machines will prove perfectly satisfactory to you."

The machine first received was operated for 31 days, when it was found that the

valve and valve seat of the skidding, or pulling, engine were being badly cut, and the same condition developed in the skidding engine of the second machine, within 6 or 7 days after defendant began operating it. The valves in question were "D," sliding, valves, the functions of which were to regulate the passage of the steam between the steam chests and the cylinders, and as the valves were 6 inches square, and the engines were operated with a pressure of 100 pounds of steam to the square inch, it follows that the outer surface of each of the valves presented superficial areas of 36 square inches and were subjected to a total pressure of 3,600 pounds. The faces of the valves were, however, cut away to such an extent as to leave only 11⅝ square inches actually bearing on the valve seats, so that (deduction being made for the steam "ports" opening through the valve seats) the surface of the valve faces, subject to friction, sustained a pressure of 310 pounds to the square inch. Beyond that, it appears that the valves did not move over the entire surfaces of the valve seats, but stopped short of the ends, and that, by the cutting of the valves into the seats, shoulders were formed in the latter, which, in turn, rounded the surfaces of the valves, at the ends, and caused the valves to "rock."

As soon as these defects were developed, plaintiff was notified, and it sent a representative, named Duscher, to inquire into them and provide a remedy. He examined the parts giving the trouble, and defendant's foreman tells the result as follows:

"He looked at that valve * * * and told us it was a mechanical defect, from the shop, and for us to take that cylinder out, or both cylinders out, and box them up and ship them to New York, and he would send us new cylinders to replace them."

The steam chests and the cylinders, it may be remarked, are cast in one piece; the valve seats being inside the chests, or valve boxes, and the valves being loose pieces, or lids, which move back and forth over the valve seats.

Those parts were, accordingly, taken out (of both engines) and shipped to the Lidgerwood Company, in New York, and were replaced by others, which proved to be no better than those which they replaced. Plaintiff was again notified, and sent up the manager of their mechanical department (French) and their expert (Duscher), who, after examination, said that still other parts would be sent, which was done, and the cutting went on, resulting in the escape of the steam and rendering the machines useless. Plaintiff then agreed that a third set of the parts should be sent, and it was also agreed that the Lidgerwood Company should send out their own expert to put them up and operate them, and that was done, with the same result as before; the expert of the Lidgerwood Company (Painter), after putting in the new steam chests, cylinders, etc., which had been left in the boxes in which they were shipped until his arrival, and operating the machines as long as he thought proper, leaving them cutting as they had done before, and offering no explanation of the cause. The Lidgerwood people also sent out another man, by the name of Dickinson, who proposed to remedy the difficulty by putting a steam dome on the boiler, not (as he says in his testimony) that he thought a dome was necessary, or would do any good, but because, without opening the steam chests, and hence without examining the valves and valve seats, he concluded that the trouble was caused by the willful introduction into the steam chests of some cutting material, such as sand, emery, or iron filings, and he thought that the putting on of the dome would have the effect of deterring the culprit from continuing his evil work.

His testimony reads, in part, as follows:

"Before we went out in the woods, we talked (of) the steam dome, and I offered to put a steam dome on the boiler because, in general

past experience, I naturally decided that there was some foreign substance introduced into the steam chest, and therefore I took it for granted that it was sediment carried over from the boilers. Q. You thought a steam dome would correct the difficulty? A. It always helps, if that is the cause; it ought to. Q. Your purpose in suggesting a steam dome was that you thought it would correct the difficulty? A. No, sir; I had other reasons. Q. You think it was a grave difficulty? A. No, sir. Q. Why did you want to put it on? A. I thought that Mr. Hummer [representing the defendant company] was just as anxious to have that machine quit cutting as I was. I thought it would give whoever was tinkering with the engine a chance to withdraw and let it alone."

In the meanwhile—that is to say, in October or November, 1906 (the visits of Painter and Dickinson having been made in December and January)—the defendant company had paid $6,000 cash, and had given the notes here sued on for the balance of the price of the skidders; the idea being that the vendor and manufacturer were responsible people and that the defects in the machines could, and would, be cured. Those defects were, however, never cured, and from the evidence in the transcript it appears that the machines are useless.

Harry N. Covell, superintendent and works manager of the Lidgerwood Manufacturing Company, testifies (under commission, executed in New York): That the company has been making engines of the pattern of those here in question since the year 1900; that it has made and shipped to its patrons 956 of such steam chests, cylinders, valves, and valve seats; that the engines were made upon the duplicate part system, which he described as follows:

"A duplicate part system is a system whereby various parts of the same size are machined exactly alike and to gauge, so that, in assembling, the necessary parts are drawn, at random, from the stock on hand and go together without fitting or any work being put on them. In other words, they are finished, complete, ready for assembling, and through the system gauges which we use absolute exactness is obtained in all essential dimensions. By means of the duplicate part system, we are enabled to supply any part called for, for repairs, and it is an exact fit."

He further testifies that they make from 10 to 20 sets of 9x10 cylinders and steam chests at a time, and from 20 to 50 valves for such cylinders, and, in answer to the question:

"If you inspected these cylinders [referring to the parts that had been returned] and found any cutting, state condition of the same and, as an expert, give your opinion as to the cause of such cutting, with the reasons for such opinion."

He says:

"I did inspect those cylinders and found very severe, deep, cutting, not alone on the valve seats of the cylinders, but on the slide valves themselves. In all of my 25 years' experience, I have never seen anything approaching this. In my opinion there can be but one cause of the cutting, and that is the introduction of some abrasive material, such as sharp sand, emery, filings, or something of like nature. My reason for this opinion is the fact that the area of the slide valve is 36 square inches, and (that), with 100 pounds steam pressure, gives a total pressure of 3,600 pounds. The wearing surface of the valve seat containing 11⅝ square inches, a resultant pressure therefore, of 310 pounds per square inch of surface. According to the last authorities, the compressive strength of cast iron is 90,000 pounds per square inch, and hence there is a margin of 89,690 pounds before the iron could begin to crush. It is absurd therefore to assume that the cutting could have been caused by insufficient area of the valve seat, or of the valve. Assuming, for the sake of argument (a fact however, which I positively deny), that there was something wrong, either about the setting of the valves, or the size of the valves, or the area of the parts, or anything like that, it would have made absolutely no difference in the cutting of the valves or the valve seats. There is not a shadow of doubt, in my mind, but what the cutting must have been caused by a foreign substance which entered the steam chest of the cylinders, either through the steam pipe from the boiler, or through the lubricator, or through the plugged hole in the throttle valve, or by deliberately placing the same in the steam chest or the cylinder. By no possibility could any sand or cutting substance get in in any other way. The iron we use in our cylinders is of a particularly homogeneous, compact nature. Daily physical tests are made, and the tensile strength of our iron is not allowed to go below 21,000 pounds per square inch. It is all the more reason therefore why, with so strong, hard, and homogeneous an iron, with a polished and lubricating surface, with a pressure per square inch over 89,000 pounds (?), within the safe limit, that the cutting must have been caused, without any question whatever, by a foreign, hard, abrasive, cutting substance, like emery, sand, boiler scales, or something like that."

The witness gives the names of some 8 or 10 persons, in different places, to whom, he says, his company has sold its 9x10 cylinder skidding engines, and they testify that the engines have been used by them for different periods, ranging from, say, 4 to 7 years, and have given satisfaction. None of them, however, give the dimensions of the valves or say whether the movements of the valves cover the entire valve seats, or, rather, whether the valve seats, proper, are flush with the surrounding surfaces, or whether, being elevated, the valves clear the whole of their surface in their travels back and forth.

Another witness for plaintiff testified that he had served for two years as a machinist's assistant in the navy, and that:

"No oil of any kind can go into the steam chests, or cylinders, of an engine belonging to the United States, and that is in operation on a vessel of the United States navy."

F. G. Proutt (called on behalf of defendant) having qualified as an expert, testified, in part, as follows:

"I * * * took the valve covers off the engines which were operating the loading drums. These, so far as I could see, were in first-class condition. We then took the valve covers off the engines that were operating the skidding drums and found them cut. * * * The seat was probably cut 1/32 of an inch below its original face; this being evidenced by the fact that there was a ridge, about 1/4 of an inch wide and 1/32 of an inch high, on either side of the exhaust port."

He says that he then experimented with a calorimeter to find out whether there was any undue amount of water coming over from the boiler, and found that there was not, and that, incidentally, he observed that there had been no cutting whatever in the cylinders; they being in perfect condition. He then examined another engine (of the McGifford make) which defendant was using, and the cylinder of which was the same size as those of the Lidgerwood engines, and found it unimpaired, and he further says that, in comparing the parts of the different engines, it occurred to him that, perhaps, the Lidgerwood skidding engines were not getting lubrication, and his testimony proceeds, as follows:

"By this, I don't mean that oil was not used for the purpose of lubricating the valves, but that none of it got between the valve and the valve seat. I then made up several drawings showing the valves and seats, in each case of the actual size, and found that the * * * valves on the loading engines of the Lidgerwood machines had a pressure of 266 pounds per square inch on the seats. The valves on the skidding engines had a pressure of 310, * * . * and the valves on the McGifford engine had a pressure of only 218 pounds, to the square inch. * * * I was under the impression that it was very difficult to lubricate valves with a pressure on the seats of more than 250 pounds per square inch. Of this fact, however, I am unable to get any exact data; but I find ample data to the effect that 300 pounds is the maximum pressure that can be used on the bearings of rotating shafts, which have a continuous oil supply. And, this being the case, I have arrived at the conclusion that, as the seat of a valve is much more difficult to lubricate than the bearing of a shaft, the valve which has been giving the trouble has got no oil under it whatever, due to excess of pressure on the seat, and has simply cut out from this cause."

It otherwise appears that French (plaintiff's representative) stated, at a time when it was practicable for defendants to look into the matter, that he had sold an engine, exactly like those in question, in Kentucky, and another in Missouri, and that the defendants sent Christie and Morris to look at them, which, having done, those witnesses testify that they differ from the engines here in question in the important particular that the travel of the valves is greater than the valve seats, which ought to be, but is not, the case with the valves and valve seats which have caused the trouble out of which this litigation has arisen.

There is nothing whatever, save the inference of Covell and Dickinson, to sustain the theory, propounded by them, that the cutting of the valves and valve seats was caused by the introduction into the steam chests of sand or other abrasive substance. It is not shown that any such substances were ever found in the steam chests, and it

is shown that, if introduced there, they must necessarily have gone through the ports, into the cylinders, and have injured them and the pistons, which was not the case; the cylinders and pistons being in perfect condition. Neither Duscher nor Painter were called on to testify, though it is said by defendant's counsel, in their brief, that Painter was in the courthouse when the case was tried, and no reason has been given by plaintiff for not putting him and Duscher on the stand. There was judgment in the lower court in favor of defendant, rejecting plaintiff's demand, setting aside the contract for the sale of the skidders, condemning plaintiff to return the $6,000 received by it, with interest from the dates of the payments, and to pay the further sum of $4,500, as damages, with interest from judicial demand and all costs. Plaintiff has appealed, and the defendant company has answered, praying for an increase in the amount awarded as damages.

### Opinion.

Plaintiff sold the skidders as practical machines, and the obligation rested on it to see that they were capable of rendering the service contemplated in their sale and purchase. It (plaintiff) and the manufacturer were afforded all the opportunity that they seemed to want, or should have needed, for the discharge of that obligation, and they, apparently, abandoned the undertaking. The experts employed by them for that purpose not only failed in their attempts, but they have not even been called to explain why they failed, and, instead of such explanation, we are furnished with a theory, propounded by other experts (whose opportunities of informing themselves as to the situation were not so good), which finds no support in the established facts or in the probabilities, as we understand them. There is absolutely nothing in the transcript, save the bare inferences which they draw, to give color to the suggestion of Covell, Dickinson and French that sand, or other abrading or cutting substance, was ever, in any way, introduced into the steam chests. Covell never saw the machines, or any of the parts, outside of New York. Dickinson looked at them as they stood in the woods, and seeing that the water used to make the steam was clear, at once assumed that the machines were in perfect condition and declined to examine them. French, on one occasion, seems to have touched one of the valve seats with his handkerchief, and, finding what he thought was oil, concluded that the part was lubricated, though no one has ever disputed that so much of the valve seats as was exposed—that is to say, the parts upon which the valves were not, for the moment, resting—would always, and necessarily, be found with oil on them. In fact, it is not unlikely that, when the valves were relieved of the pressure of the steam, the oil would find its way beneath them. Neither of the witnesses named, nor any other, even hints that he ever saw any trace of sand, emery, filings, or other abrasive substance in the steam chests, and, as we have stated, Duscher and Painter, the experts employed by plaintiff and by the Lidgerwood Company to solve the riddle, and who examined the machines, have not been called on to testify, and, so far as appears, made no report of their examinations, save that Duscher told defendant's people that there was a mechanical defect in the valves, that it was a shame that a first-class concern, like the Lidgerwood Company, should send out engines in the condition that they were in, and that they (defendant's employés) should take the cylinders out and return them to New York. and others would be sent out to replace them. And that course was pursued, without objection from plaintiff or the Lidgerwood Company, not only once, but three

times (some of the witnesses say, five times). Added to this remarkable failure on the part of the plaintiff to produce affirmative testimony, if any it had, the record discloses negative and affirmative facts which go to show that the theory upon which plaintiff appears to rely is a remarkable theory. There is no circumstance established, or suggested, which would warrant the suspicion that any human being was interested in disabling the engines in question. It is shown, affirmatively, and Dickinson seems to concede, that no sediment could have been introduced into the steam chests by water brought over from the boiler. It is also shown that it was impossible, or next to impossible, that any abrasive substance should have been introduced through the lubricator; and, finally, it is shown that, if any such substance had been so introduced, it must inevitably have been carried, with the steam, into the cylinders, but that none was found in the cylinders, which remained unimpaired.

As the matter stands therefore plaintiff having sold the machines as capable of rendering certain service, and defendant having found them comparatively useless, it was for the plaintiff, not defendant, to ascertain and remove the cause of their incapacity, and this it has failed to do, though afforded the amplest opportunity. Defendant, on the other hand, shows what are said to be two errors in the design and construction of the machines, to wit: The one, having the valves so made that they are pressed against their seats with such force as to exclude the necessary lubricant; the other, having the valves and their seats so arranged that the "travel" of the valves does not extend beyond the surfaces of the seats.

Plaintiff's experts seem to attempt to answer the first of these propositions by saying that the compressive strength of the iron used by the Lidgerwood Company is 90,000 pounds to the square inch, and the tensile strength, 21,000 pounds; but, whether they deduce from those facts that the iron cannot be worn away, by friction, with less pressure, is not altogether clear. Mr. Covell, it may be remarked, predicates his testimony concerning the strength of the iron and its connection with the question here at issue upon the assumption that the rubbing surfaces were "polished and lubricated," and does not deal with the problem of unlubricated surfaces or with the question of the amount of pressure required to exclude lubrication. Mr. French admits that there is a limit of pressure beyond which lubrication may be impossible, but does not appear to know what the limit is, in the matter of sliding valves. Dickinson assumes that the trouble was caused by sand, or something of that sort, apparently, because he knows of nothing else to attribute it to. It may be conceded that hard iron will not wear so rapidly as soft iron, and it may also be conceded that the iron of which the valves and valve seats in question were made was of the hardest. We know, however, as admitted and uncontroverted facts, that in the two 9x10 skidders engines, with a pressure of 310 pounds to the square inch on the valve seats, the iron was badly worn, or cut; that, in the two 9x10 loading engines, the same iron, with a pressure of 266 pounds to the square inch, under the valve faces, was not appreciably worn or cut; and that, in another engine (also 9x10), from another factory, used for both loading and skidding, with a pressure of 218 pounds to the square inch on the surface of the valve seats, there was no appreciable wearing or cutting. It seems clear therefore that the compressive and tensile strength of the iron have but little, if anything, to do with the case. To the second of the propositions stated, we find no answer at all, and, in the only 9x10 Lidgerwood engines (other than the skidder engines involved in this case), which defendant

appears to have had an opportunity of examining, the "travel" of the valves was found to extend beyond the surfaces of the valve seats. However, as we have before intimated, it was no part of the contract, and is not the business, of defendant, as the purchaser of the engines, to find out and explain the defects which prevent them from doing the work contemplated, and, having found that the engines will not do that work because of the cutting out or undue wearing of the valves and valve seats, its explanation of that phenomenon is gratuitous, and it makes no difference whether it be correct or incorrect; the obligation, in such case, to find the cause of the trouble, and to remove it, resting upon the vendor, by whom it has not been discharged.

The defendant company alleges that the defective machines have caused it loss to the amount of $18,500, made up of the following items, to wit: (1) Wages of expensive crews employed to operate the engines, $5,000; (2) loss resulting from inability to turn out lumber to meet contracts, $10,000; (3) fixed wages of employés who were kept idle waiting for the machines, $3,000; (4) amount paid for repairs to machines, $500. L. E. Campbell, defendant's local manager, was the only witness examined on the subject of these damages. He says nothing about the alleged loss resulting from inability to turn out lumber to meet contracts, and, referring to cost of the repairs to the machines, says that it "amounted to several hundred dollars," but that they kept no separate account of that kind of labor. Referring to the other two items, he says:

"From November 1, 1906, to March 31, 1907, we lost about 61 days on account of not having logs at the mill to saw. This was in addition to over a million feet of logs that had been hauled to the track by teams in our employ."

He testifies that the fixed expenses of the plant, while shut down, were $105 per day; that the capacity of the mill was 100,000 feet per day; but that the largest output for any one day was 55,000 feet; that the hauling, by mule and ox teams, went on continuously when the weather permitted; and that, during the five months mentioned, they hauled 440,000 feet. Being asked:

"Now, on those 61 days that you did not work, what were those men that were not working at the time doing?"

He replied:

"This loss of time was not for a continuous period of about 61 days, but was composed of hours and days during five months' operations. Those men were either monthly or weekly men, and we paid so much per week, or month, with no lost time. * * * Q. Well, on those days that those men were not working on the engines, what were they doing? A. That is difficult to answer. Some of them were idle, and others were doing other work? Q. Do you know which were idle and which were doing other work? A. I can't say. I kept no record of it."

We find considerable correspondence in the transcript, and, included therein, a letter from the witness (Campbell) to the plaintiff, of date February 3, 1907, in which, among other things, he says:

"You know we are depending on the two 'skidders' to do our work, and one of them has become inoperative on account of the valves being cut so that we cannot hold steam. Fortunately, we have team logs, at the track, and we are supplying the mill with them, and by the use of the McGifford loader; but the supply will soon be exhausted (and) as soon as this log supply gives out we will suffer material loss by not being able to log the mill. We therefore earnestly urge you to proceed, with all possible dispatch, to have these machines made right, and we await your reply."

On February 18th he writes again, and, after referring to the warning of probable loss contained in the previous letter, says:

"In this connection it is pertinent to say that we have some team logs delivered to the right of way of our railroad, which logs have been in process of delivery for the past three months. We have been keeping our mill going from this log supply and the use of one skidder that we are now operating; the other skidder having become inoperative on account of the valve seats cutting to such an extent that we cannot hold steam. The log supply is about exhausted, and it is imperative that we have both machines operating to keep our mill going."

Considering the inability of the writer of these letters to fix, as a witness in the case, with any degree of certainty, the loss sustained by defendant, in connection with the letters themselves, from which it appears that, prior to February 18, 1907, no actual loss from delay had been complained of, we find that the amount to which defendant may be entitled is left to conjecture, and we should not feel authorized to render a judgment on that basis.

Plaintiff's plea of prescription as against the demand for the setting aside of the contract is not well founded. The defects which rendered the machines useless should have been known to plaintiff, but were not understood by defendant to be of a character which would authorize a redhibitory action, until the plaintiff and the manufacturers of the machines abandoned their attempt to cure them, and it was not until then (well, within the year preceding the filing of the answer and demand in reconvention) that the prescription relied on began to run. Reynaud & Sucko v. Guillotte & Boisfontaine, 1 Mart. (N. S.) 227; Murphy v. Guitierez, 20 La. Ann. 407.

Nor do we find the plaintiff more fortunate in urging (in this court, for the first time, as we understand it) the objection that defendant has made no tenders of the skidders. The objection should have been specially pleaded. Wood v. Nicholls, 33 La. Ann. 744; Ware v. Berlin, 43 La. Ann. 536, 9 South. 490. Moreover, by the institution and prosecution of this suit, for the balance of the price of the skidders, plaintiff, in effect, declared its intention to enforce the contract, and made it evident that a tender in avoidance of that contract would have been but a vain thing. We are, however, of opinion that the machines, in the condition in which they now are, should be returned, as a condition precedent to the execution of the judgment for the repetition of the amount paid on account of the price.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be amended by striking therefrom the item of $4,500, awarded to the Engel Land & Lumber Company as damages, and by rejecting said demand, and that it be further amended by decreeing that, as a condition precedent to the execution of the judgment in favor of said company for the sum of $6,000, paid by it on account of the purchase price of the skidders, said skidders, in the condition in which they now are, be tendered to and placed at the disposal of the plaintiff. It is further decreed that, as thus amended, said judgment be affirmed. The defendant, the Engel Land & Lumber Company, to pay the costs of the appeal.