359 So.2d 1094 (1978)
John H. WHITE, d/b/a White Construction & Equipment Rental Company, Plaintiff-Appellee,
v.
MARTIN GMC TRUCKS, INC., et al., Defendants-Appellants.
No. 6504.
Court of Appeal of Louisiana, Third Circuit.
May 24, 1978.
Rehearings Denied July 5, 1978.
*1096 Raggio, Farrar, Cappel & Chozen, Thomas L. Raggio, Lake Charles, for defendant-appellant, General Motors Corp.
Maurice L. Tynes, Lake Charles, for defendant-appellant, Martin GMC Trucks.
W. Ellis Bond, Lake Charles, for defendants-appellants.
Camp, Carmouche, Palmer, Carwile & Barsh, Karl E. Boellert, Lake Charles, for plaintiff-appellee.
Before CULPEPPER, DOMENGEAUX and WATSON, JJ.
WATSON, Judge.
Plaintiff, John H. White, d/b/a White Construction & Equipment Rental Company, purchased 15 new dump trucks from defendant, Martin GMC Trucks, Inc., between November 9, 1971, and June 1, 1972, at prices ranging from $16,170.50 to $16,465.50, or a total of $244,112.50. Martin; General Motors Corporation, the manufacturer of the trucks; and General Motors Acceptance Corporation, which financed the credit part of the purchase, were named as defendants in this suit for rescission of the sale and damages. The suit was later compromised and dismissed as to General Motors Acceptance Corporation.
Consolidated for trial and this appeal was docket # 6503, Martin GMC Trucks, Inc. v. Homer White, d/b/a White Construction & Equipment Rental, 359 So.2d 1102, a suit on open account for $4,151.65 in parts and services used to repair the trucks. It was stipulated that this amount was claimed by Martin and had not been paid by White. (Vol. 15, TR. 2454, 2455).
After a lengthy trial, the record of which is contained in 21 volumes, the trial court rendered a consolidated judgment. An award was made in docket # 6504, in favor of White, against Martin GMC Trucks, Inc. and General Motors Corporation, in solido, for $272,242.26, with legal interest from date of judicial demand. In docket # 6503 the suit by Martin GMC Trucks, Inc. was dismissed. Martin GMC Trucks, Inc. has perfected a devolutive appeal in docket # 6503. Both Martin GMC Trucks, Inc. and General Motors Corporation have appealed suspensively in docket # 6504. White has answered the appeal in docket # 6504, asking an increase in the attorney's fees awarded and an additional fee for services on appeal.
The issues are redhibition, prescription, quantum and attorney's fees.
Redhibition
Both defendants contend that the trial court was manifestly erroneous in finding the trucks to be defective. Martin GMC's and General Motors' position is that the dump trucks sold to White did not have redhibitory vices and defects but broke down because of driver abuse and lack of maintenance. The record provides a convincing evidentiary basis for the trial court's factual conclusions that the trucks were unfit for their intended use; and that the defects must have existed at the time of the sale, because they became apparent soon after the trucks were put into use; and continued to recur frequently. The trial court accurately summarized extensive testimony about the trucks, and we adopt his analysis, as follows:
"They [the trucks] reached Lake Charles in November and December of 1971, but because of bad weather, no extensive use was made of the fleet until the early spring of 1972. As soon as the weather permitted handling the clay and the trucks could go into the pit regularly, nearly all of the trucks began to develop trouble primarily in the driveline. The driveline consists of the mechanical components that connect the transmission box to the axles, transferring the energy from the engine to the wheels. If a coupling device in the driveline, such as a universal joint (herein frequently `U-joint'), the yokes, propeller shafts, etc., should break, the truck has to stop until it is repaired. This particular driveline was made more complicated by the necessity for an auxiliary transmission in addition to the *1097 main transmission because of the truck's weight bearing capacity.
There were repeated breakdowns involving all of the trucks. A large number of these are documented by Martin GMC's own repair orders and invoices. Repairs by Martin GMC documented on the first ten trucks are reflected in 217 invoices.1 Additionally, documented repairs are reflected by 34 invoices from Howell Industries, Inc., a machine shop in Lake Charles, and 11 invoices from Clark's Spring Service of Lake Charles. Such heavy reliance on the machine shop, Howell Industries, Inc., was made necessary, according to the testimony of plaintiff and his witnesses, by the failure of Martin GMC to stock adequate replacement parts, together with the multitude of breakdowns involving identical parts, requiring the machining of these parts in order to get the trucks back in operation.
1 Some of these invoices deal with simple inspection charges and servicing charges, and are therefore not probative as to any redhibition claim. Many other invoices, however, deal with multiple repairs that do suggest redhibition and the number of invoices bears a reasonable kinship to the number of repairs that are probative of redhibition.
In addition to these documented instances of repairs there was testimony by White, his superintendent, his head mechanic, and his drivers of a number of instances of breakdowns where no documentation of repairs was made because the work was done in White's shop with parts cannibalized from an already deadlined vehicle, or parts derived from other sources for which no evidence exists.
According to the invoices of Martin GMC, there were a minimum of 65 U-joint failures and replacements affecting the first 10 trucks. From November of 1971 until November of 1972, during the time truck No. 1 was traveling some 28,000 miles, it suffered nine U-joint failures and required a number of yoke replacements, as well as other problems. It had four U-joint failures in the month of October 1972. This truck was modified in July of 1973 at the expense of General Motors by the installation of a heavier duty driveline assembly. Truck No. 2 had seven U-joint failures during a similar period and six yoke replacements. In addition, there were several driveshaft replacements and a rear axle replacement as well as an auxiliary transmission repair. Truck No. 3 had four U-joint failures in a three month period of time in 1972, along with several yoke failures, the failure of a rear axle and transmission problems. The driveline was modified in June of 1973 by the installation of the JV9500 Series heavier duty driveline assembly. Truck No. 4 did not suffer the number of U-joint and yoke failures as did the others. However, its rights rear axle had to be replaced and in July of 1973 the same driveline modification was performed on it as had been performed on the others. Truck No. 5 also had the same driveline modification performed in June of 1973 after several yoke and bolt failures and four U-joint failures. Truck No. 6 was especially vulnerable, having 13 U-joint replacements and five yokes, along with a broken axle shaft and intermediate propeller shaft. Truck No. 7 had four U-joints replaced and six yokes replaced, along with other driveline failures, before its driveline was modified in June of 1973 with a heavier duty assembly. Truck No. 8 had six U-joint failures and eight yoke failures, with other troubles, within a relatively short time. Its driveline was modified with the heavier duty driveline in June of 1973. Truck No. 9 had seven U-joint failures and yoke and axle and shifting problems. Its driveline was modified in June of 1973. Truck No. 10 had to have eleven U-joints replaced and seven yokes. It also had multiple transmission problems.
Shortly after the weather permitted the job to get seriously underway, the remaining five trucks were delivered to White in early June of 1972. He also experienced driveline problems with these vehicles until their drivelines were modified along with the rest. Four of these latter vehicles were also beset with brake problems.
White's witnesses testified that over 200 driveline failures stopped the trucks in 1972 and 1973. Considering the number of documented instances of driveline failures and repairs, that is a credible estimate.
*1098 Neither side offered convincing proof at the trial as to why the drivelines suffered so many failures. The most likely and reasonable explanation was that the driveline was simply not up to the job it was called upon to perform.
Until the driveline assemblies were modified in the middle of 1973, Martin GMC and General Motors' response to White's difficulties were not successful. Several trial and error techniques were explored to try and remedy the problems.
In September of 1972 White wrote General Motors a letter pointing out that his biggest problem continued to be the breaking of U-joints and yokes and requesting that General Motors help him to try and determine why it was that the bolts kept backing out causing the breaks. He was referring to what was by that time everybody's conclusion that the real cause of the breaking U-joints and yokes was that the bolts that connected the U-joints and the yokes to the driveline assembly kept working loose. Apparently in agreement that the working out of the bolts had something to do with the problem, Mr. Martin had earlier recommended the use of a special type of glue, but this did not do any good. As early as May of 1972 there was evidence that a General Motors official with the Technical Service Department was recommending the installation of the heavier duty driveline series. However, James D. Ingle, General Motors regional service manager located in Memphis, decided first to try the installation of heavier yokes, with some heavier yokes and U-joints. This was done but the failures continued. After that, General Motors recommended the use of different bolts and the application of maximum torque. This likewise failed to cure the problems. The replacement of the heavier driveline assemblies was completed in mid-1973. No further trouble of any significance was experienced. In late 1973 While brought this action against Martin GMC and General Motors. He was behind in his payments and shortly after this action was brought GMAC foreclosed on the trucks. That foreclosure suit was later dismissed, but White lost possession of the trucks.
White contends that the trucks were not fit for the purpose intended and for the use to which he put them. He contends that these particular trucks were `specced' by Mr. Martin himself on the basis of detailed information about the requirements of the job. He contends that the driveline assembly on the trucks was too weak for that job, that they were incapable of withstanding the ordinary demands made upon them by routine performance of that job and that they were therefore affected by redhibitory vices and defects and that consequently, both the seller and General Motors, the manufacturer, are liable." (TR. 176-181).
The trial court was convinced that the defense of driver abuse and lack of maintenance was not regarded as a problem when the trucks were breaking down. The evidence confirms this further factual conclusion. Compare Rey v. Cuccia, 298 So.2d 840 (La., 1974).
Defendants also contend that White is not entitled to maintain this action, because he failed to tender the trucks. White's petition alleges and offers a tender. Prior to suit being filed, White was in the unfortunate position of trying to pay for the trucks, being billed by Martin for repair costs and paying for other repairs on his own. Return of the trucks to Martin was not financially feasible. The trucks were repeatedly tendered for repair, until Martin GMC refused to do additional repair work except on a cash basis (Vol. 15, TR. 2477). Tender then would obviously have been futile, since Martin had effectively disclaimed any further responsibility for the trucks' defects. Martin GMC's refusal to attempt additional repairs shows that the trucks' tender would not have been accepted. A formal tender is not required when the vendor has indicated one would be useless. See Wiltz v. Dixie Auto Sales, Incorporated, 315 So.2d 811 (La.App. 3 Cir. 1975); Slay v. Ater, 305 So.2d 691 (La.App. 3 Cir. 1974); Peoples Fur. & G. v. Carson Hicks/Friedrichs Ref., Inc., 326 So.2d 919 *1099 (La.App. 3 Cir. 1976); and Purvis v. Statewide Trailer Sales, Inc., 339 So.2d 403 (La. App. 1 Cir. 1976).
Suit # 6503 was filed shortly after this one, and White then voluntarily surrendered the trucks, which Martin resold.
Prescription
Both General Motors and Martin GMC contend that their exceptions of prescription should have been sustained by the trial court. Plaintiff White filed suit on November 29, 1973. The trial court concluded that prescription was interrupted as to both defendants because Martin GMC and GM cooperated in efforts to repair the trucks through the middle of 1973.
Edward G. Martin, president of Martin GMC Trucks, Inc., qualified as an expert in the sales, service and specifications of trucks as well as their maintenance. Martin testified that White told him about a proposed dirt hauling project on I-210. White projected moving a million yards of dirt under a contract with Rimmer & Garrett, Inc. On the basis of Martin's experience in writing specifications on dump trucks and a data book furnished by General Motors Corporation, Martin recommended the particular trucks that White purchased (Vol. 8, TR. 1210). Martin stated that trucks offered by Nelson Dodge, each at $2300 less than his, were unsuited for the job. Martin represented that the GM trucks were fit for White's purpose and had the qualities needed for the work White proposed to do, which was heavy dirt hauling. Martin knew that General Motors has special equipment options available but thought trucks built to standard specifications would be suitable for White's job. Martin was aware that dirt and clay were to be hauled and knew the weights of wet and dry clay. Martin and his sales manager, John Icklone, who actually handled the transaction, conferred and agreed about the specifications for the trucks. It is significant that Icklone testified he knew the truck bodies were too large for White's job when the trucks were sold (Vol. 10, TR. 1469, 1493). For some unknown reason, the transmission on one truck broke down in Mississippi while the truck was enroute to Martin's place of business for delivery to the purchaser (Vol. 9, TR. 1309). This breakdown required extensive repair work prior to the sale (Vol. 9, TR. 1373). Martin represented that the trucks had the qualities necessary for their intended use when he knew or should have known they did not. Compare Spillers v. Montgomery Ward & Company, Inc., 294 So.2d 803 (La., 1974) and Media Pro. Consult., Inc. v. Mercedes-Benz of N. A., Inc., 262 La. 80, 262 So.2d 377 (1972). The action is covered by LSA-C.C. arts. 2547[1] and 1847.4[2], which define the rights of the buyer in the context of a sale such as this.
Martin GMC not only warranted that the trucks were free from hidden defects and reasonably fit for their intended use, its president and majority stockholder selected them for that use and must be presumed under these circumstances to know of their defects. LSA-C.C. art. 2545;[3]Rey v. Cuccia, 298 So.2d 840 (La., 1974).
*1100 A manufacturer is presumed to know the defects in its product. Weaver v. Fleetwood Homes of Mississippi, Inc., 327 So.2d 172 (La.App. 3 Cir. 1976).
A redhibitory action against a seller in bad faith must be instituted within a year of the buyer's discovery of the vice. LSA-C.C. art. 2546.[4] However, this prescriptive period is interrupted by the seller's attempts at repair. Prescription then runs from the date on which the vendor abandons its attempts to cure the defects. Woodward-Wight & Co. v. Engel Land & Lumber Co., 123 La. 1093, 49 So. 719 (1909); Barnidge v. Cappel Motor Co., 12 La.App. 216, 125 So. 778 (1930); Brown v. Dauzat, 157 So.2d 570 (La.App. 3 Cir. 1963); Alexander v. Burroughs Corp., 350 So.2d 988 (La.App. 2 Cir. 1977).
Martin contends that the repairs on the trucks were not at its (the seller's) expense but at the expense of the manufacturer, and prescription was not interrupted as to Martin GM Trucks. This resourceful argument overlooks the fact that a warranty agreement between GM and Martin could not affect Martin's obligation to the purchaser. The fact that Martin looked to GM for reimbursement did not affect its duty to White. Martin GMC attempted to repair the trucks and White's rights against Martin are unaffected by Martin GMC's relationship with the manufacturer. See Radalec, Incorporated v. Automatic Firing Corp., 228 La. 116, 81 So.2d 830 (1955).
According to Martin's records, repairs on the drive trains, transmissions, U-joints, pinion gears and yokes of the trucks were as follows:

 Serial No. First repair date Last repair date
 ______ __ _____ ______ ____ ____ ______ ____
 1. 514247 May 18, 1972 February 27, 1973
 2. 515579 May 1, 1972 June 15, 1973
 3. 514225 May 1, 1972 November 21, 1972
 4. 542375 August 7, 1972 June 22, 1973
 5. 542368 July 3, 1972 July 20, 1973
 6. 509857 June 29, 1972 July 20, 1973
 7. 542912 July 27, 1972 November 30, 1972
 8. 514260 May 1, 1972 June 21, 1973
 9. 513625 August 1, 1972 June 15, 1973
10. 508070 March 25, 1972 November 9, 1972
11. 513593 May 9, 1972 June 15, 1973
12. 512765 April 28, 1972 June 21, 1973
13. 537748 July 27, 1973 July 27, 1973
14. 513580 July 26, 1973 July 26, 1973
15. 546057 June 22, 1973 June 22, 1973

Martin testified that, although the records are not complete as to three units (numbers 3, 7 and 10), all 15 trucks had a portion of the drive line replaced with heavier universal joints supplied by General Motors at its expense during the summer of 1973. Additional repair work is detailed in the trial court reasons for judgment quoted supra.
General Motors' representatives and Martin GMC attempted to alleviate White's problems with the trucks through 1973. Until these efforts were abandoned, White did not know the defects in the trucks could not be corrected. See Purvis v. Statewide Trailer Sales, Inc., 339 So.2d 403 (La.App. 1 Cir. 1976). This suit, filed November 29, 1973, was timely as to both the seller and the manufacturer. Kennedy v. Vidalia Home Service, Inc., 256 So.2d 827 (La.App. 3 Cir. 1972).
Quantum
The trial court itemized White's damages as follows:

Installment payments: $142,332.20
Delivery from Tenn.: 953.18
Insurance premiums: 10,358.00
Repairs: 11,479.25
White's mechanics' repair time: 52,272.18
Rental of substitute trucks: 13,452.45
Loss of profits: 18,895.00
Attorney's fees: 22,500.00
 ___________
Total: $272,242.26

Defendants contend that they are entitled to a credit for White's use of the trucks; that White's damages were not correctly calculated; that White is not entitled to interest from date of judicial demand; and that White is not entitled to recover his insurance premiums.
*1101 Plaintiff White's counsel acknowledges in brief that the correct award for insurance is $9,338 rather than $10,358, because the amount shown on P-43 at Vol. 4, p. 769, was subject to a refund credit. Insurance against physical damage to the trucks was required by the terms of the sale and chattel mortgage agreements executed by White in connection with the purchase. Compulsory insurance costs can be recovered in an action of redhibition. Purvis v. Statewide Trailer Sales, Inc., supra. The judgment for insurance premiums will be reduced by $1,020, the refund credit.
Appellants, Martin GMC Trucks, Inc. and General Motors, contend that they are entitled to a credit or offset for White's use of the trucks. LSA-C.C. art. 2531 prior to its amendment in 1974 provided:
LSA-C.C. art. 2531. Liability of seller in good faith for restitution of price
"The seller who knew not the vices of the thing, is only bound to restore the price, and to reimburse the expenses occasioned by the sale, as well as those incurred for the preservation of the thing, unless the fruits, which the purchaser has drawn from it, be sufficient to satisfy those expenses."
This article applies only to a seller in good faith. A seller in bad faith does not receive credit for fruits derived from the use of the thing by the purchaser and is liable for damages under LSA-C.C. art. 2545. Here we have a seller in bad faith and constructive fraud as defined in LSA-C.C. arts. 2547 and 1847(4). Both the manufacturer and the seller are liable in solido. Media Pro. Consult, Inc. v. Mercedes-Benz of N. A., Inc., 262 La. 80, 262 So.2d 377 (1972). Defendants have no right to recover the fruits resulting from the combination of White's labor and his use of the trucks. It is conceded that there is no separate proof of the value of the use of the trucks. Even if a credit for this use were appropriate, use of the thing sold and use of the price are regarded as equal in the absence of specific evidence by which to evaluate the use of the thing. Counsel for Martin GMC contends that this formula cannot be used in a credit sale, but the credit here was extended by General Motors Acceptance Corporation, a third party, rather than by the vendor. Compare Smith v. Max Thieme Chevrolet Company, Inc., 315 So.2d 82 (La.App. 2 Cir. 1975). No further allowance or offset is indicated. Alexander v. Burroughs Corporation, 350 So.2d 988 (La.App. 2 Cir. 1977); Wheat v. Boutte Auto Sales, 355 So.2d 611 (La.App. 4 Cir. 1978).
The trial court cast both defendants for damages and attorney's fees and allowed recovery for loss of profits directly attributable to the redhibitory defects in the trucks. The loss of profits was not awarded on the basis of the total number of hours in which the trucks were unavailable, which was calculated at 5364.5. "Profit shrinkage" (TR. 195) of $6.03 an hour was awarded for the 2230.92 hours during which replacement vehicles were rented or $13,452.45. Loss of profits for the 3133.58 hours of "down time" (TR. 195) when replacement vehicles were not rented was also calculated at $6.03 an hour or $18,895.00. Lost profits is a proper item of recovery against a seller and manufacturer in bad faith. Radalec, Incorporated v. Automatic Firing Corporation, 228 La. 116, 81 So.2d 830 (1955). There is no abuse of discretion in the formula adopted by the trial court. LSA-C.C. art. 1934.3 states that damages ". . . are the amount of loss the creditor has sustained, or of the gain of which he has been deprived . . . ."
It is contended that the damages awarded should not include interest from the date of judicial demand but this is contrary to the jurisprudence on the subject which specifically allows such interest. Moreno's, Inc. v. Lake Charles Catholic H. Schs., Inc., 315 So.2d 660 (La., 1975); Rey v. Cuccia, 298 So.2d 840 (La., 1974).
Attorney's Fees
White has answered the appeal asking for an increase in the attorney's fees of $22,500 awarded by the trial court and an additional award of attorney's fees for services on appeal. The award by the trial court is within its much discretion. An *1102 additional sum of $2,000 will be awarded for services on appeal.
For the foregoing reasons, the judgment of the trial court herein is amended: (1) to award the additional sum of $2,000 in attorney's fees to counsel for plaintiff, John H. White, d/b/a White Construction & Equipment Rental Company; and (2) to reduce the judgment for insurance premiums by the amount of $1,020; and, as amended, the judgment of the trial court herein is affirmed at the cost of defendants-appellants, Martin GMC Trucks, Inc. and General Motors Corporation.
AMENDED AND AFFIRMED.
DOMENGEAUX, J., concurs in result.
NOTES
[1] LSA-C.C. art. 2547:

"A declaration made by the seller, that the thing sold possesses some quality which he knows it does not possess, comes within the definition of fraud, and ought to be judged according to the rules laid down on the subject, under the title: Of Conventional Obligations.
"It may, according to the circumstances, give rise to the redhibition, or to a reduction of price, and to damages, including reasonable attorneys' fees, in favor of the buyer."
[2] LSA-C.C. art. 1847.4:

"Fraud, as applied to contracts, is the cause of an error bearing on a material part of the contract, created or continued by artifice, with design to obtain some unjust advantages to the one party, or to cause an inconvenience or loss to the other. From which definition are drawn the following rules:
* * * * * *
"4. But a false assertion of the value or cost, or quality of the object, will constitute such artifice, if the object be one that requires particular skill or habit, or any difficult or inconvenient operation to discover the truth or falsity of the assertion. * * *"
[3] LSA-C.C. art. 2545:

"The seller, who knows the vice of the thing he sells and omits to declare it, besides the restitution of the price and repayment of the expenses, including reasonable attorneys' fees, is answerable to the buyer in damages."
[4] LSA-C.C. art. 2546:

"In this case, the action for redhibition may be commenced at any time, provided a year has not elapsed since the discovery of the vice.
"This discovery is not to be presumed; it must be proved by the seller."