**RED DIAMOND SUPPLY, INC.,**
**Plaintiff-Appellant,**

v.

**LIQUID CARBONIC CORPORATION et al., Defendants-Appellees.**

No. 78–2751.

United States Court of Appeals,
Fifth Circuit.
Unit A

Feb. 23, 1981.

Russell & Derussy, Patrick D. Breeden, Henican, James & Cleveland, C. Ellis Henican Jr., New Orleans, La., for plaintiff-appellant.

Peter Frank Liberto, New Orleans, La., for defendants-appellees.

Before WISDOM, AINSWORTH and GEE, Circuit Judges.

GEE, Circuit Judge:

Liquid Carbonic Corporation ("Liquid"), a manufacturer of industrial gas products, supplied such products to three distributors in the New Orleans area, including plaintiff Red Diamond Supply ("Red Diamond") and defendant Acme Welding and Supply Company ("Acme"), which was acquired by defendant Awisco Corporation. Liquid also sold some of its products directly to customers who used them. Red Diamond alleged that a conspiracy existed between Liquid and its three distributors, including Red Diamond itself, to maintain territorial and customer restrictions on sales of Liquid's products; that Liquid, in concert with Acme, terminated Red Diamond for transgressing these restrictions; and that Liquid and Acme thus violated, inter alia, sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1,

2, the corresponding provisions of the Louisiana antitrust laws, La.Rev.Stat.Ann. §§ 51:122, :123, and a prohibition of the Louisiana Unfair Trade Practices and Consumer Protection Law, La.Rev.Stat.Ann. § 51:1405.[1] Red Diamond also alleged that Liquid participated in a national conspiracy with other manufacturers of industrial gases to restrict competition among themselves and that, pursuant to this conspiracy, Liquid prevented its distributors from competing for the customers of other manufacturers and their distributors.

Red Diamond settled its claims against Liquid shortly before commencement of a jury trial in the district court but proceeded to press the same claims against Acme and Aswico. Prior to submitting the case to the jury, the court granted the defendants directed verdicts on Red Diamond's Sherman Act section 2 and corresponding state antitrust claims, which are not appealed, and on its Louisiana unfair trade practices claim. The jury returned a verdict for defendants on Red Diamond's Sherman Act section 1 claim, which also is not appealed, but found for Red Diamond on its claim under the Louisiana counterpart of section 1. The court, however, granted judgment n. o. v. to defendants on the state antitrust claim because it found the evidence of a conspiracy involving Acme insufficient to sustain the verdict. Red Diamond appeals the judgment n. o. v., as well as the court's directed verdict on its state unfair trade practices claim.[2] We affirm both of the court's decisions, although on grounds different from those upon which the court relied.

## I. The Louisiana Antitrust Claim.

The sole antitrust claim before us is one arising under Louisiana law, La.Rev.Stat.

Ann. § 51:122, that state's counterpart to section 1 of the Sherman Act.[3] There is very little case law construing or applying the Louisiana antitrust statutes and none that is particularly helpful to us in this case. The state antitrust statutes, however, were fashioned after the federal antitrust statutes, *Diliberto v. Continental Oil Co.*, 215 F.Supp. 863, 864 (E.D.La.1963), and the court below ruled that, except for the federal interstate commerce requirement, the same principles of law apply under both. Since we typically accord deference to a district court's decision regarding the law of the state in which it sits, *Hensley v. E. R. Carpenter Co.*, 633 F.2d 1106, 1111 (5th Cir. 1980); *Watson v. Callon Petroleum Co.*, 632 F.2d 646, 648 (5th Cir. 1980), since we find authority consistent with the court's decision in this instance, *Louisiana Petroleum Retail Dealers v. The Texas Co.*, 148 F.Supp. 334, 337 (W.D.La.1956), and none to the contrary, and since all of the parties before us accept that decision, we will proceed under the guidance of federal law, and in particular the law of this circuit. In doing so, however, we emphasize that we are but vicariously applying what we presume to be the law of Louisiana.

The district court granted defendants' motion for a judgment n. o. v. because it found the evidence insufficient to establish a conspiracy to impose territorial and customer restrictions on Liquid's distributors and to terminate Red Diamond for violating those restrictions. We find it unnecessary, however, to examine the sufficiency of the evidence thereon because we conclude that even if Liquid did require its

---

1. Red Diamond also urged violations of other statutes, but these claims were disposed of early in the proceedings below on a grant of summary judgment from which Red Diamond does not appeal.

2. The court also granted defendants a new trial conditioned on a reversal by this court of the judgment n. o. v., and Red Diamond also appeals this decision. But since we do not reverse the judgment n. o. v., we need not consider the propriety of the grant of a new trial.

3. Section 51:122 provides:

    Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce in this state is illegal.

    Whoever violates this Section shall be fined not more than five thousand dollars, or imprisoned, with or without hard labor, not more than three years, or both.

    Section 51:137 confers a civil action for treble damages on parties injured by violations of section 51:122.

distributors to agree to abide by territorial and customer restrictions, Red Diamond has not shown that such an agreement, and hence its alleged termination pursuant thereto, would contravene antitrust law.

■ The first step of our analysis is to determine whether the alleged conspiracy was horizontal or vertical. If horizontal, it would be illegal per se, *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 58 n.28, 97 S.Ct. 2549, 2561 n.28, 53 L.Ed.2d 568 (1977); if vertical, it would be tested by the rule of reason, *id.* at 58–59, 97 S.Ct. at 2561–62. The district court instructed the jury that the alleged conspiracy was a horizontal one because Liquid sold some of its products directly to customers in competition with its distributors. We disagree.

Conspiracies between a manufacturer and its distributors are only treated as horizontal ... when the source of the conspiracy is a combination of the distributors. *United States v. Arnold, Schwinn & Co.*, 388 U.S. 365, 372–73, 87 S.Ct. 1856, [1862, 63] 18 L.Ed.2d 1249 (1967); *cf.* Posner, *The Rule of Reason and the Economic Approach: Reflections on the Sylvania Decision*, 45 U.Chi.L.Rev. 1, 17 (1977) (condemning distributor cartels).

*H&B Equipment Co. v. International Harvester Co.*, 577 F.2d 239, 245 (5th Cir. 1978). When the manufacturer is the source, the conspiracy is vertical.[4] *Arnold, Schwinn & Co.*, 388 U.S. at 372, 87 S.Ct. at 1862; *In re Nissan Antitrust Litigation*, 577 F.2d 910, 915 (5th Cir. 1978), *cert. denied*, 439 U.S. 1072, 99 S.Ct. 843, 59 L.Ed.2d 38 (1979); *H&B Equipment Co.*, 577 F.2d at 245–46. Since the allegation here is that Liquid imposed an agreement upon its distributors to abide by territorial and customer restrictions, that agreement is a vertical one, and the restrictions imposed are vertical restrictions.

That Liquid also distributed some of its own goods does not alter the situation. *See Arnold, Schwinn & Co.*, 388 U.S. at 369–72, 87 S.Ct. at 1860–1862 (territorial and customer restrictions imposed by a manufacturer on its wholesale distributors are vertical even though the manufacturer also distributed directly to retailers); *H&B Equipment Co.*, 577 F.2d at 245–46 (conspiracy between a manufacturer and one of its dealers to terminate another dealer is a vertical conspiracy even though the manufacturer also sells direct); *In the Matter of the Coca Cola Co.*, 91 F.T.C. 517, 610–15 (1978) (territorial restrictions imposed by a soft drink manufacturer on independent

---

**4.** The reason for focusing on the source of restraints on distributors is economic. Distributors have an incentive to agree among themselves to restrict competition, such as by allocating territories, *in order to* raise the price they receive for their product because to do so normally increases their profits. Such a horizontal conspiracy, which generates simply an increase in prices, is generally detrimental to consumers and is illegal per se.

Not only does a horizontal conspiracy among distributors hurt consumers, however; it injures the manufacturer as well because the higher retail price of the product reduces the quantity sold at retail and hence the quantity demanded from the manufacturer. A manufacturer generally prefers that its distributors sell its product for as low a price as possible, given the price at which it sells the product to them, i. e., for as small a markup as possible over the wholesale price, because its sales of the products are normally greater the lower the retail price. *See Continental T.V.*, 433 U.S. at 56 & n.24, 97 S.Ct. at 2560 & n.24. A manufacturer thus will typically encourage intrabrand competition in order to enhance interbrand compe-

tition, *i. e.*, the competitiveness of its product with those of other manufacturers. Sometimes, however, a manufacturer will find it advantageous to impose restrictions, such as assigned territories, *on its distributors in order to* induce them to undertake advertising or promotional activities, to render more or better services to customers, or simply to push the product more vigorously. By facilitating such efforts on the part of distributors, the restrictions tend to increase retail sales of the product, and may do so on balance even if they also generate some increase in the price the distributors charge. Thus, restrictions on intrabrand competition are sometimes a means whereby a manufacturer can increase interbrand competition. Because increasing interbrand competition is generally socially desirable and because intrabrand restrictions are generally not socially harmful when there is significant interbrand competition, manufacturer-imposed, *i. e.*, vertical, restraints are governed by the rule of reason. *See id.* at 54–55, 97 S.Ct. at 2559–2560; *but see id.* at 51 n.18, 97 S.Ct. at 2558 n.18 (vertical price restrictions are per se illegal).

bottlers are vertical even though the manufacturer also has bottling subsidiaries). *But cf. Hobart Brothers Co. v. Malcolm T. Gilliland, Inc.,* 471 F.2d 894 (5th Cir.) (territorial restrictions imposed on a distributor by a manufacturer that also distributes its products itself are horizontal where the distributor also manufactures products · that compete with those of the manufacturer), *cert. denied,* 412 U.S. 923, 93 S.Ct. 2736, 37 L.Ed.2d 150 (1973). When a producer elects to market its goods through distributors, the latter are not, in an economic sense, competitors of the producer even though the producer also markets some of its goods itself; rather, the distributors are "agents" of the producer, employed because the producer has determined that it can supply its goods to consumers more efficiently by using distributors than it can by marketing them entirely by itself. *See Continental T.V.,* 433 U.S. at 56 & n.24, 97 S.Ct. at 2560 & n.24; note 4, *supra.* While it is possible that a nominally vertical arrangement may in fact be a horizontal one in disguise, *e. g., United States v. Topco Associates, Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972) (territorial restrictions imposed by a buying association on its members are horizontal where the members collectively own the association); *United States v. Sealy, Inc.,* 388 U.S. 350 (1967) (territorial restrictions imposed by a manufacturer on its licensees are horizontal where the licensees own the manufacturer); *see Continental T.V.,* 433 U.S. at 57 n.28, 97 S.Ct. at 2561 n.28, such is not the case here.[5]

█ Since the alleged restrictions are vertical (and not directed at fixing prices[6]), their legality is governed by the rule of reason. *Continental T.V., supra; H&B Equipment Co.,* 577 F.2d at 246. In order to prevail under the rule of reason, a plaintiff must show that the defendants' conduct has an adverse effect on competition. *Daniels v. All Steel Equipment, Inc.,* 590 F.2d

111, 113 (5th Cir. 1979); *H&B Equipment Co.,* 577 F.2d at 246; *Northwest Power Products, Inc. v. Omark Industries, Inc.,* 576 F.2d 83, 90 (5th Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.,* 549 F.2d 368, 380 (5th Cir. 1977). This Red Diamond failed—and did not even seriously attempt—to do. While the restrictions it alleged presumably would reduce intrabrand competition, *i. e.,* competition among Liquid's distributors, to some extent, this presumptive effect by itself is not sufficient to establish injury to competition for several reasons.

First,

[t]he Supreme Court in *Continental T.V.* recognized that a reduction in intrabrand competition is not pernicious as long as there exists interbrand competition, which acts as a "significant check on the exploitation of intrabrand market power because of the ability of consumers to substitute a different brand of the same product." 433 U.S. at 53 n.19, 97 S.Ct. at 2559.

*Daniels v. All Steel Equipment, Inc.,* 590 F.2d at 113. The record strongly suggests that there was significant interbrand competition in industrial gas products in the New Orleans area. It reveals, for example, that there were a total of seven manufacturers or suppliers of these products and a considerable number of their distributors serving the area. The products themselves, moreover, were highly undifferentiated so that different brands were readily substitutable for each other in actual use. These facts are strongly indicative of a competitive market, and there is little in the record suggesting the contrary. Red Diamond, for example, did not produce market share data to support an inference that the market, despite the number of firms, was in fact concentrated. It did not even introduce

---

5. Given the divergent interests between a manufacturer and its distributors, *see* note 4, *supra,* it is unlikely that a manufacturer not controlled by its distributors, such as Liquid, would be a party to a distributor-created, and hence distributor-serving, conspiracy.

6. Vertical price restrictions are per se illegal. *Continental T.V.,* 413 U.S. at 51 n.18, 97 S.Ct. at 2558 n.18.

Liquid's market share to suggest that Liquid's intrabrand restrictions might have had an effect on interbrand competition in the market. Indeed, as the district court found, Red Diamond failed to prove just what the relevant market was. The record indicates, moreover, that Liquid was not in fact the largest producer of industrial gas products in the New Orleans area. Red Diamond did allege a conspiracy between all the manufacturers and suppliers of gas products not to compete among themselves—which would indicate a lack of competition—but the evidence it produced was not sufficient to establish such a conspiracy,[7] and the jury most probably rejected it as well.[8] Thus, we find no basis for inferring a lack of interbrand competition or that the alleged restrictions adversely affected interbrand competition.

Not only does the record not demonstrate that the alleged restrictions harmed interbrand competition; it suggests that they may have improved it. Because each manufacturer's products are virtually indistinguishable structurally, service is an important basis upon which the firms can compete, and Liquid could well have decided that confining each of its distributors to a particular area or type of customer would enable them more effectively to service their customers and thus would increase the demand for Liquid's goods. Both the Supreme Court and this court have recognized that vertical restrictions on intrabrand competition well may increase interbrand competition. *See Continental T.V.*, 433 U.S. at 54–55, 97 S.Ct. at 2559–60; *Del Rio Distributing, Inc. v. Adolph Coors Co.*, 589 F.2d 176, 179 (5th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 80, 62 L.Ed.2d 52 (1979); note 4, *supra.*

The final reason why we find the presumed reduction in intrabrand competition insufficient to constitute injury to competition is that, given the apparent nature of the market and Liquid's relative place in it, Liquid most probably could have chosen, consistent with the antitrust laws, to do all of its own distributing in the New Orleans area, either by cancelling its distributors

---

7. The principal evidence upon which Red Diamond relied was the testimony of a former Liquid salesman, Robert L. Williams, III. That testimony, together with a letter to which Red Diamond refers, establishes at most that Liquid did not seek business from customers or distributors *under contract* to a competitor. Williams also testified, however, that Liquid would sell to a customer that was willing to cancel its contract with the competitor. Thus, the proffered evidence may well demonstrate only that Liquid preferred exclusive dealing arrangements or that it was wary of inducing breaches of contract. While Williams' testimony is probably consistent with the existence of a conspiracy among manufacturers, it is not sufficient to establish such a conspiracy. At the very least, there would have to be some showing of an agreement between Liquid and other manufacturers, which there is not.

Red Diamond also relied on documents showing a wide divergence in the prices Liquid charged its distributors throughout the country for cylinder oxygen. While Red Diamond offered these data to prove a lack of competition among manufacturers, the documents on their face show that the price differentials are explainable simply in terms of differences in the cumulative volume of cylinder oxygen sold. The other bits of evidence Red Diamond offered are similarly unprobative of a conspiracy among manufacturers.

8. The trial judge instructed the jury that the state and federal antitrust offenses alleged both had the same elements except that the latter also carried an interstate commerce requirement, and the jury found a state but not a federal violation. Thus, the jury apparently found the interstate commerce requirement not to have been met. It is clear, however, that the intermanufacturer conspiracy Red Diamond alleged extended well beyond the borders of Louisiana. It would appear, therefore, that the jury rejected the allegation of such a conspiracy. That it should do so, moreover, is not surprising since the principal evidence offered was the testimony of former Liquid salesman John Williams, *see* note 7, *supra*, who not only was a friend of the president of Red Diamond but also testified that a deposition he had previously given in the case was perjured.

It is possible, however, that the jury concluded that a conspiracy among manufacturers did exist but that defendant Acme, which was merely one of Liquid's distributors, was not involved in the conspiracy. But since the alleged agreements between Liquid and its distributors were supposedly an integral part of the intermanufacturer conspiracy, Acme may well have been chargeable as a coconspirator in the broader scheme as a matter of law.

and expanding internally or by simply acquiring the distributors themselves.[9] If Liquid had thus vertically integrated into distributing, it clearly could have instructed its employees to abide by territorial and customer restrictions. And since Liquid could have accomplished these ends by either internal expansion or merger, either of which would have had an even greater impact on intrabrand competition, we fail to see why it would have been unreasonable for Liquid to accomplish the same ends by contract. *See Northwest Power Products, Inc. v. Omark Industries, Inc.*, 576 F.2d 83, 89 (5th Cir. 1978) ("If a defendant could achieve a desired result either by lawful merger or by engaging in unfair competition, the choice of the unfair competition route alone should not give rise to an antitrust violation."), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *Associated Radio Service Co. v. Page Airways, Inc.*, 624 F.2d 1342, 1351 (5th Cir. 1980) (the defendant in *Northwest Power Products* "probably could have eliminated all distributors of its products by vertical integration (*i. e.*, by beginning distribution of its own products) without running afoul of the antitrust laws"). To hold otherwise would in general simply create "an incentive for vertical integration into the distribution system, thereby eliminating to that extent the role of independent businessmen." *Continental T.V.*, 433 U.S. at 57 n.26, 97 S.Ct. at 2561 n.26.

In sum, Red Diamond under the rule of reason had the burden of proving anticom-petitive effect, *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d at 380, and this it failed to do. Since it did not establish that the restrictions Liquid allegedly imposed upon it contravened the antitrust laws, it perforce did not show that its alleged termination for violating those restrictions constituted an antitrust offense.[10] Thus, we affirm the judgment n. o. v. entered by the district court.

## II. *The Louisiana Unfair Trade Practices Claim.*

Red Diamond also appeals the district court's directed verdict on its claim under the Louisiana Unfair Trade Practices and Consumer Protection Law, which in part proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La.Rev.Stat.Ann. § 51:1405(A). Under section 51:1409(A), "[a]ny person who suffers any ascertainable loss of money or movable property, corporeal or incorporeal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by R.S. 51:1405, may bring an action individually but not in a representative capacity to recover actual damages." The district court issued its directed verdict because it decided that lost profits, the type of damages Red Diamond alleged, were not "actual damages" under section 51:1409(A). While we have serious reservations about this decision,[11] we need not conclusively re-

---

9. At least one manufacturer in the New Orleans area in fact did all of its own distributing in that area.

10. Also, Red Diamond produced no evidence that its termination per se had an anticompetitive effect. *See Daniels v. All Steel Equipment, Inc., supra; H&B Equipment Co., supra.*

11. According to the Louisiana Supreme Court, "actual damages" as used in section 51:1409 means simply "[monetary] relief other than the refund of the purchase price and the return of the status quo that constitutes restitution." *Louisiana ex rel. Guste v. General Motors Corp.*, 370 So.2d 477, 486 (La.1979). Generally, the Louisiana courts allow recovery of lost profits as a component of damages in such contexts as breach of contract, *George W. Gar-*

*ig Transfer, Inc. v. Harris*, 226 La. 117, 130, 75 So.2d 28, 33 (1954); *Al Smith's Plumbing & Heating Service, Inc. v. River Crest, Inc.*, 365 So.2d 1122, 1126 (La.Ct.App.1978), torts, *Brien v. Quality Transport, Inc.*, 309 So.2d 743 (La.Ct. App.1975); *Camus v. Bienvenue*, 91 So.2d 99, 101 (La.Ct.App.1956) (Tate, J.), and defective products, *White v. Martin GMC Trucks, Inc.*, 359 So.2d 1094, 1101 (La.Ct.App.), *remanded on other grounds*, 362 So.2d 1116, 1117 (La.), *reinstated on remand*, 365 So.2d 1135, 1136 (La.Ct.App.1978), *writ denied*, 367 So.2d 391 (La.1979). The district court cited no authority for its pronouncement that lost profits are not comprehended in the damage remedy afforded by § 51:1409, and we find none. Nor did the court offer policy reasons for its decision, and since loss of profits is the typical injury from

solve them because we find that the restrictions Liquid allegedly imposed on its distributors and Red Diamond's alleged termination for violation thereof do not contravene section 51:1405(A).

As with the Louisiana antitrust claim, we find no state case law applying the relevant statute to facts resembling the ones before us. Because of the similarity between section 51:1405(A) and section 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1),[12] however, Louisiana courts look to interpretations of the latter provision for guidance in construing the former.[13] *Gour v. Daray Motor Co.*, 373 So.2d 571, 576–78 (La.Ct.App.), *writ of review granted*, 376 So.2d 1270 (La.), *dism'd as moot*, 377 So.2d 1033 (La.1979); *Moore v. Goodyear Tire & Rubber Co.*, 364 So.2d 630, 633–34 (La.Ct. App.1978); *Guste v. Demars*, 330 So.2d 123, 125 (La.Ct.App.1976). Also, section 51:1406(4) exempts from the coverage of section 51:1405(A)—and the rest of the statute—"[a]ny conduct which complies with section 5(a)(1) of the Federal Trade Commission Act [15 U.S.C. 45(a)(1)], as from time to time amended, any rule or regulation promulgated thereunder and any finally adjudicated court decision interpreting the provisions of said Act, rules and regulations."

Under section 5(a)(1), vertical territorial and customer restrictions are not illegal absent a showing of injury to competition. *See Sandura Co. v. FTC*, 339 F.2d 847 (6th Cir. 1964); *Snap-On Tools Corp. v. FTC*, 321 F.2d 825 (7th Cir. 1963). Since Red Diamond failed to prove injury to competition, the court's directed verdict, as well as its judgment n. o. v., is

AFFIRMED.

some forms of unfair competition, such as disparaging a competitor's product, we suspect that policy considerations might well cut against the rule announced by the court. Also, *see* note 13, *infra*.

12. Section 5(a)(1) provides that "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."

13. Since the Federal Trade Commission Act does not afford a private cause of action for damages for violations of § 5, neither the Act nor the federal case law it has spawned provide any guidance on whether lost profits are recoverable under its Louisiana counterpart. *See* note 11, *supra*. Lost profits generally are recoverable as damages under the Sherman Act, however. *E. g., Greene v. General Foods Corp.*, 517 F.2d 635, 663 (5th Cir. 1975), *cert. denied*, 424 U.S. 942, 96 S.Ct. 1409, 47 L.Ed.2d 348 (1976).