**DAVIS–WATKINS COMPANY,**
Plaintiff-Counter
Defendant-Appellee,

and

**Amana Refrigeration, Inc., Counter**
Defendant-Appellee,

v.

**SERVICE MERCHANDISE,**
Defendant-Counter
Plaintiff-Appellant.

No. 81–5057.

United States Court of Appeals,
Sixth Circuit.

Argued April 13, 1982.

Decided Aug. 23, 1982.

Donald F. Mintmire, Barrett, Alagia & Carey, St. John Barrett, Washington, D. C., for Service Merchandise.

Steven A. Riley, Bass, Berry & Sims, Robert J. Walker, Nashville, Tenn., for Amana Refrigeration, Inc.

Stephen J. Holtman, Simmons, Perrine, Albright & Ellwood, Cedar Rapids, Iowa, F. Clay Bailey, Jr., John R. Edwards, Nashville, Tenn., for Davis-Watkins Co.

Before MARTIN and CONTIE, Circuit Judges, and TUTTLE,[*] Senior Circuit Judge.

CONTIE, Circuit Judge.

Service Merchandise Company, Inc., (SMC) appeals the disposition of its antitrust counterclaims brought under section 1 of the Sherman Act, 15 U.S.C. § 1, against Amana Refrigeration, Inc., (Amana) and the Davis-Watkins Company (D–W). SMC asserts that the district court erroneously dismissed its per se theories of price stabilization, group boycott and horizontal market divisions on cross-motions for summary Judgment.[1] SMC also asserts that the jury was erroneously instructed on the application of the rule of reason under its vertical restraint claim.[2]

In August 1980, Amana and D–W filed for partial summary judgment on SMC's per se claims alleging that this case was indistinguishable from the case *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). They asserted that inasmuch as SMC challenges non-price vertical restraints the case should be submitted to the jury only under the rule of reason test. SMC responded with a cross-motion requesting judgment on all of its claims. The district court granted Amana and D–W's motion finding the case to be controlled by *Sylvania, supra.*

The case, therefore, was submitted to the jury only under the rule of reason and only in regard to non-price vertical restraints. And, after a seven-week trial, the jury returned a verdict in favor of the appellees finding no restraint of trade in violation of 15 U.S.C. § 1.

## I.

SMC is a Tennessee corporation engaged in a showroom catalog business marketing name-brand consumer goods and jewelry for retail sales from 110 showrooms in 25 states. Sales occur either through the mails or in one of SMC's showrooms. Amana is a Delaware corporation that manufactures household appliances, including countertop microwave ovens for household use. D–W is Amana's exclusive distributor for the ter-

---

[*] Honorable Elbert P. Tuttle, Senior Judge of the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

1. At the district court, SMC contended that its claim of illegal vertical market divisions should be analyzed under a per se analysis. SMC concedes, however, that vertical non-price restraints are properly analyzed under the rule of reason. *See Davis-Watkins Co. v. Service Merchandise Co.,* 500 F.Supp. 1244 (M.D.Tenn. 1980).

2. This action was initially commenced by D–W alleging that SMC was practicing predatory pricing in violation of the Sherman Act and the Robinson-Patman Act, 15 U.S.C. § 13(a). By order of the district court this claim was dismissed on October 10, 1980. SMC counterclaimed, however, against D–W and Amana under the theories stated above and the disposition thereof by the district court is what has been appealed.

ritory of central Tennessee and adjoining parts of Alabama, Georgia and Kentucky.[3]

In 1976 SMC attempted to enter the market of retailing a particular model of Amana Radarange. Since mid-1978, however, it has been unable to obtain such ovens from Amana, D–W or any other Amana distributor or dealer. SMC contends that the reason it has been unable to obtain any Amana Radarange ovens is that Amana and its distributors have established geographic, customer and location restrictions in order to maintain and enhance wholesale and retail prices, to insulate distributors from price competition from other distributors and dealers and to prevent SMC and other discount retail dealers from dealing in Amana countertop microwave ovens.

The microwave oven industry has recently emerged, marketing the only "new" major kitchen appliance. By 1975 there were 20 manufacturers and 27 different brands of microwave ovens. Amana, however, was one of the first producers of countertop microwave ovens. And, during the period 1972 through 1979 Amana controlled between 11% to 18% of this market. Amana has built up a certain degree of prestige within the industry as a result of its market position.

Prior to January 1, 1978, Amana distributors were assigned by agreement to a primary territory for concentration of sales efforts. Distributors were free to select retailers without execution of franchise agreements and they were not prohibited from selling outside of their primary territory.

Also during the period prior to 1978, wholesale and retail prices varied as much as 30% between territories due to differing distributor and dealer transportation and operating costs. Because of this difference in price two marketing problems developed in Amana's distribution system: retailer price-shopping and transhipping. First, where retailers had outlets in more than one territory, retailers began to buy all of

their needed product in the territory with the lowest prices. To discourage price-shopping, therefore, Amana encouraged and assisted distributors in two types of selling arrangements to such retailers: 1) a distributor would supply the retail outlets in his area only but at agreed prices, or 2) a distributor would supply retailers within and outside his territory but would pay a commission to the distributor whose territory was affected.

The second problem, related to retailer price-shopping, known as transhipping, occurred when ovens were purchased within one territory, where the price was favorable to the purchaser, for resale and/or use within another territory. The purchaser could sell at lower prices because his original purchase was less than that of retailers in the transhipped-to territory.

These problems and especially transhipping did not present a problem to Amana or its distributors until late 1976. Before the end of 1976 the demand for Amana Radaranges continued to increase so that distributors did not accumulate large inventories. Consequently, absent a need to unload inventories, there was very little transhipping between territories. However, inventories began to accumulate in 1976 and transhipping became a serious problem within Amana's marketing system.

Amana increased its production of countertop microwave ovens from 173,000 units in 1975 to 321,000 units in 1976. During 1976, however, several Japanese manufacturers entered the microwave market which caused a decrease in market demand for Amana Radaranges. For example, the general market increased from 1,749,000 units in 1976 to 2,157,000 units in 1977 but Amana's share of the market dropped from 18% to 11%. Amana decreased the number of units shipped to distributors from 321,000 units in 1976 to 240,000 units in 1977. The accumulation of large inventories by Amana's distributors and dealers caused them to seek outlets to unload upon. Consequently,

---

**3.** Amana has 58 independent and 9 wholly-owned exclusive distributors throughout the United States, each operating under a separate written distributor agreement. There also exists approximately 3500 authorized Amana retail dealers.

transhipping began to occur with increased frequency.

As a result, unauthorized dealers were obtaining Amana ovens at low prices in one territory for resale in another territory. Prices set by authorized dealers were undercut by the transhippers. Price competition resulted among Amana dealers and between these dealers and transhippers. It is important to note, however, that the unauthorized dealers who were transhipping were outside the Amana marketing system and were thereby able to offer a low price because they offered no product services. Unlike Amana's authorized distributors and dealers, the transhipper did not incur the cost of providing services associated with Amana's microwave ovens. Such services were, however, necessarily offered by the authorized Amana distributors and dealers.[4]

In November of 1976, while large inventories of Amana microwave ovens were accumulating, SMC attempted to purchase one Amana Radarange model from D–W. SMC requested 600 ovens but D–W refused to fill the order. From that time until mid-1978, SMC attempted to obtain the ovens from several other Amana distributors but was denied by each.[5] SMC did obtain Radaranges from diverters, however, in 1976 and 1977 and sold them at lower prices than did Amana dealers.[6]

In December of 1976, D–W by letter complained to Amana concerning SMC's low prices, attaching a copy of an SMC advertisement of Amana Radaranges, and asserting that such competition had to be eliminated. Starting in January of 1977, Amana received other complaints from other dealers and distributors concerning SMC's low prices as well as the low prices of other unauthorized discount catalog-showroom dealers. Also during this period, D–W requested that Amana supply it with the identity of the transhipper.

On October 3, 1977, Amana announced to its distributors a clarification of its policy on transhipping. The crux of the clarification notice was that Amana's incentive rewards would be given to the distributor in whose area sold merchandise is used rather than to the selling distributor irrespective of whether the seller is a distributor or dealer. The incentive programs included were the profit opportunity program (distributor profits increased as volume sales increased), merchandising and promotional allowances, display programs, coop programs and special advertisement programs. Amana also warned that the source of its Radaranges would be tracked through its computer tracking system.[7]

Starting on January 1, 1978, Amana revised its distributor agreements by adding the following resale restrictions: 1) distributors agreed to sell only to authorized Amana dealers, 2) authorized dealers had to be located within the distributor's exclusive territory, 3) distributors had to obtain the agreement of authorized dealers to restrict resales from their authorized locations and only to consumers, and 4) distributor promotional and service charge-back policy pursuant to the October 3, 1977, transhipping letter remained in effect. In February, Amana sent new authorized dealer sales and service agreements to its distributors for the purpose of imposing these re-

4. The authorized distributor or dealer who has an excess inventory will sell to unauthorized dealers who tranship because they will neither incur service costs nor lose customers. Such service costs, both pre-sale and post-sale, are incurred in the territory in which the product is ultimately sold.

5. SMC attempted to purchase from 7 other Amana distributors prior to 1978, four of whom were located in areas where SMC had showrooms, but sales were refused.

6. A diverter is a broker of products who buys from authorized dealers or distributors with the purpose of diverting such products to a destination or to a purpose different from what is represented when the products are purchased.

7. It is important to recognize at this point that the United States Supreme Court issued the decision in *Continental T.V., Inc., v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) effectively changing the law with respect to vertical non-price restrictions imposed by a manufacturer in the summer of 1977. With this change Amana began imposing restrictions upon its distributors and dealers with regard to the sale of its Radaranges.

strictions upon authorized dealers by agreement. As a result of these restrictions, SMC's sources dried up and the Amana Radarange was dropped from its catalog.

## II.

At issue in this case are two divergent marketing strategies. Amana's marketing strategy is aimed at enhancing interbrand competition whereas SMC's marketing strategy is aimed at enhancing intrabrand competition. Amana markets its ovens with a strategy of supplying an oven plus services. SMC, on the other hand, attempted to market the ovens without supplying any services.

The services that Amana requires of its distributors and dealers are of three types: pre-sale, point-of-sale and post-sale services. Pre-sale services include advertisements, special displays, proper display of a full line of Amana ovens, in-store demonstrations, cooking instructions and trained salespersons on the floor to answer questions. Point-of-sale services include in-store demonstrations and the availability of trained salespersons. Post-sale services include warranty service, product maintenance and repair services and cooking schools. The cost of such services is shared by Amana, the distributors and the dealers so that all have a stake in the marketing of Amana's ovens. The services are promoted by Amana through promotional and incentive programs, cost-sharing discount sales programs, demonstration programs, accessory give-away programs and advertisement programs.

In promoting these services, Amana is attempting to compete on the interbrand market of microwave ovens by offering a product plus services at a competitive price. Amana recognizes that the product can be sold at a lower price where such services

are eliminated. But Amana also contends that its market strategy cannot survive where some dealers sell the product at a low price without providing the accompanying services. Further, Amana contends that if price competition is the sole basis on which unauthorized dealers compete, authorized dealers will not have an incentive to share the cost of services with distributors because the competition providing just the product without any accompanying services creates a "free rider" effect upon those who do provide services.[8]

The restrictions imposed by Amana upon its authorized distributors and dealers both before and after January 1, 1978, were designed to enhance Amana's market strategy of providing their product plus services. Indeed, during the course of oral argument, counsel for Amana and D–W stated that they do not deny that Amana's restrictions may have some effect on price nor that they may result in SMC not being able to obtain the product.

## III.

Section 1 of the Sherman Act proscribes "[e]very contract, combination ... or conspiracy, in restraint of trade or commerce...." 15 U.S.C. § 1. In recognizing that every trade agreement restrains trade, the Supreme Court has held that only unreasonable contracts, combinations or conspiracies in restraint of trade are illegal. *Standard Oil Co. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). To establish a claim under section 1, the plaintiff must establish that the defendants contracted, combined or conspired among each other, that the combination or conspiracy produced adverse, anti-competitive effects within relevant product and geographic markets, that the objects of and conduct pursuant to that contract or conspiracy

---

**8.** The "free rider" problem arises where presale, point-of-sale or post-sale services are offered by the manufacturer's authorized distributors and dealers. Discounters are tempted by market forces to obtain and retail the same product without offering such services. Because the discounter does not incur the cost of providing services, it is able to offer the "raw"

product at lower prices. Further, consumers are able to obtain and take advantage of the services provided by the authorized distributors and dealers while ultimately purchasing from the discounter. Finally, the authorized distributors and dealers are thereby required to offer services by the manufacturer without obtaining the benefit of retail sales.

were illegal and that the plaintiff was injured as a proximate result of that conspiracy. *Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139, 147 (3d Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1715, 72 L.Ed.2d 137 (1982). Generally, market conduct is analyzed under the rule of reason test for a determination of whether such conduct is illegal under section 1 of the Sherman Act. In *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918), the classic description of the rule of reason was given:

> The true test of legality is whether the restraint imposed is such as merely regulates and perhaps thereby promotes competition, or whether it is such as may suppress or even destroy competition. To determine that question the court must ordinarily consider the facts peculiar to the business to which the restraint is applied; its condition before and after the restraint was imposed; the nature of the restraint, and its effect, actual or probable. The history of the restraint, the evil believed to exist, the reason for adopting the particular remedy, the purpose or end sought to be obtained, are all relevant facts.

*Id.* at 238, 38 S.Ct. at 243.

Some market conduct, however, is analyzed under an illegal per se test on the basis that such conduct is manifestly anticompetitive. The Supreme Court has stated:

> Certain agreements or practices ... because of their pernicious effect upon competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse

for their use. This principle of *per se* unreasonableness not only makes the type of restraints which are prescribed by the Sherman Act more certain to the benefit of everyone concerned, but it also avoids the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable—an inquiry so often wholly fruitless when undertaken.

*Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Practices generally found to be illegal per se are group boycotts, price-fixing, horizontal market divisions and tying arrangements.[9]

 It is well settled that unilateral action within a particular market is not a violation of section 1. *United States v. Colgate & Co.*, 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919). Section 1 requires proof of "concerted action". Further, restraints imposed by a manufacturer or supplier upon its distributors or retailers, so-called "vertical" restraints, are generally found to be potentially beneficial to interbrand competition. Analysis of vertical restraints, therefore, requires the application of the rule of reason. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). However, restrictive agreements among independent business entities at the same level of the market, so called "horizontal" agreements, are found to have a pernicious effect upon competition and to lack redeeming virtue, so that analysis proceeds under a per se illegal rule. *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d

---

**9.** Group boycotts are concerted refusals by traders to deal with other dealers, *Klor's Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1957); price-fixing is any combination or concerted action that is formed for the purpose or with the effect of raising, depressing, fixing or stabilizing the price of a commodity in interstate or foreign commerce, *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940); horizontal market divisions are

agreements between competitors to allocate markets, *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972); tying arrangements are agreements to sell a product on the condition that the buyer also purchases a different product or at least agrees not to purchase the product from any other supplier, *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

515 (1972). The difficult issue presented by this case is whether the territorial, location and customer restrictions, as well as the alleged group boycott and price stabilization, were imposed within the Amana distribution chain as vertical restraints, originating as unilateral action from the manufacturer Amana, or whether they operated as horizontal restraints, originating from agreement or concerted action among distributors or retailers.

■ The Supreme Court has recognized that a manufacturer has an interest in maintaining as much intrabrand competition as is consistent with the efficient distribution of its products. *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 56, 97 S.Ct. 2549, 2560, 53 L.Ed.2d 568 (1977). Thus, in determining whether non-price restraints are imposed vertically or horizontally—i.e. whether the non-price restraints should be analyzed under rule of reason or as illegal per se—the focus of inquiry must be upon the effect and purpose of such restrictions. Indeed, the Supreme Court states that in determining whether non-price restraints should be analyzed under a per se rule:

> Our inquiry must focus on whether the effect and, here because it tends to show effect, *see United States v. United States Gypsum Co.,* 438 U.S. 422, 436 n.13, 98 S.Ct. 2864, 2873 n.13, 51 L.Ed.2d 854 (1978), the purpose of the practice are to threaten the proper operation of our predominantly free-market economy—that is, whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output, and in what portion of the market, or instead are designed to "increase economic efficiency and render markets more, rather than less, competitive. *Id.* at 441, n.16 [98 S.Ct. at 2875 n.16]."

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 441 U.S. 1, 19–20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). A determination of the source of the restraints imposed and whether such restraints are consistent with the manufacturer's market strategy will expose the purpose of such restraints. *Com-Tel, Inc. v. Dukane Corp.,* 669 F.2d 404, 410–411 (6th Cir. 1982); *see also, A. H. Cox & Co. v. Star Machinery Co.,* 653 F.2d 1302, 1307 (9th Cir. 1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1004 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981).[10]

### IV.

The district court dismissed SMC's per se claims of group boycott, price stabilization and horizontal market divisions via summary judgment on the basis that SMC did not demonstrate the existence of horizontal concerted action—concerted action by competitors of SMC. Summary judgments are somewhat disfavored in antitrust cases, especially when motive or intent is at issue. *See Poller v. Columbia Broadcasting Sys.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962). The evidence must be viewed in a light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences. Only if the evidence is not disputed as to any material fact should the case be decided as a matter of law rather than submitted to the jury. *Smith v. Hudson,* 600 F.2d 60 (6th Cir. 1979), *cert. dismissed,* 444 U.S. 986, 100 S.Ct. 495, 62 L.Ed.2d 415 (1979). However, the absence of any relevant probative evidence in support of a litigant's antitrust claims will expose such claims to summary judgment disposition.

■ Restraints imposed vertically, through the market position of a manufacturer or supplier, requires standard analysis

---

10. The reason for focusing on the source of the restraint is to determine the purpose of the restraint. A restraint imposed by distributors is generally for the purpose of restricting supply or price competition, *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1004 n.4 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981), whereas restraints imposed intrabrand by a manufacturer may be imposed for the purpose of competing more effectively in the interbrand market, *Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 54–55, 97 S.Ct. 2549, 2559–2560, 53 L.Ed.2d 568 (1977).

under the rule of reason. Departure from this standard analysis must be based upon demonstrable economic effect and a showing that the vertical restrictions have or are likely to have a pernicious effect on competition or that they lack any redeeming virtue. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 58–59, 97 S.Ct. 2549, 2561–2562, 53 L.Ed.2d 568 (1977). Consequently, summary judgment in this case was improper only if the evidence, viewed in a light most favorable to SMC, demonstrates that the restrictions imposed facially appear to always or almost always tend to restrict competition and decrease output. If, however, the evidence supports a finding that the restrictions were designed and imposed by Amana to increase Amana's economic efficiency and thereby render markets more competitive, then summary judgment was properly granted.

### A.

In asserting that the district court erred in granting summary judgment in favor of Amana and D–W with regard to its group boycott claim, SMC contends that this case is governed by and is indistinguishable from *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966). SMC contends that Amana and its distributors engaged in a joint effort to prevent it and other discount houses from obtaining a supply of microwave ovens and to cut off any supply obtained.

In *General Motors*, three associations of Chevrolet dealers as well as GM participated in a group boycott to eliminate sales of new Chevrolets through discount houses and referral services. The Chevrolet dealers formed associations and complained to GM about sales to discounters, embarked on a letter writing campaign to enlist GM's aid, agreed with GM not to deal with discounters, formed an association to police the agreements between GM and the Chevrolet dealers, and the association supplied GM information for use in bringing wayward dealers into compliance. The Supreme Court held that an illegal group boycott existed between the associations of Chevrolet dealers and GM. The Court stated:

Neither individual dealers nor the associations acted independently or separately. The dealers collaborated through the associations and otherwise, among themselves and with General Motors, both to enlist the aid of General Motors and to enforce dealers' promises to forsake the discounters.

. . . .

Nor did General Motors confine its activities to the contractual boundaries of its relationships with individual dealers. . . . The evidence indicates that [GM] had no intention of acting in this unilateral fashion. On the contrary, overriding corporate policy with respect to proper dealer relations dissuaded General Motors from engaging in this sort of wholly unilateral conduct, the validity of which under the antitrust laws was assumed, without being decided, in [*United States v. Parke, Davis & Co.*, 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960)].

*Id.* at 143–144, 86 S.Ct. at 1329–1330 (footnotes omitted).

The Supreme Court found concerted action to create an illegal group boycott based on two dispositive factors. First, GM acted in concert with its dealers *for their benefit* rather than to enforce a location clause by unilateral action. *See id.* at 149 (Harlan, J., concurring in result). Had GM taken unilateral action to strengthen and enforce its own marketing strategy through its dealers, an illegal group boycott would not have existed. Second, the dealers and associations did not act independently or separately but rather banded together among themselves and with GM in order to eliminate discounters as competitors. Toward this purpose the dealers and associations as a group demanded GM to impose and enforce location restrictions.

In the present case, the district court found that SMC failed to show that the distributors or dealers demanded the restrictions from Amana. The lower court held that prior to January 1, 1978, only D–W was requested to sell to SMC and D–W's sole complaint regarding SMC's

price competition was not sufficient to find a demand for a group boycott. The court further held that complaints by other dealers and distributors were also insufficient to support a group boycott theory.

Reviewing the facts of this case, we agree with the conclusion of the district court. SMC did not attempt to retail Amana's full product and there is no evidence in the record that any of the distributors or dealers by concerted action among themselves and with Amana refused to deal with SMC. There is insufficient evidence that a conspiracy or concerted action existed to support a variation from the general rule that non-price vertical restraints should be analyzed under the rule of reason.

The fact that distributors and dealers complained to Amana concerning SMC's pricing of Amana ovens does not, without more, balloon this case into an illegal boycott. Dealer initiated contact or actively sought change does not establish that a manufacturer did not ultimately impose restrictions based on its independent business judgment. *A. H. Cox & Co. v. Star Machinery Co.*, 653 F.2d 1302, 1307 (9th Cir. 1980). *Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3rd Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981). There is no evidence that would establish dealer coercion causing Amana to act otherwise than consistent with its market strategy. SMC has not submitted any evidence that Amana's distributors or dealers acted jointly.[11] Complaints to Amana by its distributors and dealers concerning SMC's low prices and lack of services does not establish a causal relationship between such complaints and Amana's imposed restrictions. For example, SMC strongly asserts that a New Orleans distributor refused to sell at Amana's request. Such evidence in no way establishes a unity of purpose or common design among distributors and dealers on a horizontal level.

Amana's actions of control over its distribution chain were consistent with its market strategy and there is no evidence that Amana acted contrary to its market strategy for the benefit of its distributors or dealers. Thus, given the facts that no evidence exists to find that distributors and dealers joined together in unity of action to exclude SMC and that no evidence exists to find that Amana acted other than in its own economic interest, a finding of a horizontal group boycott cannot be supported. *Sweeney & Sons, Inc. v. Texaco, Inc.*, 637 F.2d 105 (3rd Cir. 1980), *cert. denied*, 451 U.S. 911, 101 S.Ct. 1981, 68 L.Ed.2d 300 (1981).

Further, at the time that SMC attempted to purchase 600 Radaranges from D–W of a particular type, D–W's refusal to sell was a refusal consistent with the need to prevent free riders. It is obvious that had the sale been made to SMC, the full Amana line of Radaranges would not have been represented in SMC's catalog showroom. Further, many of the pre-sale and point-of-sale services would not have been offered.

There exists no evidence that SMC was attempting to enter Amana's distribution chain on a basis consistent with Amana's marketing strategy. SMC contends that some services that Amana requires were offered by SMC for other products. However, at no time did SMC offer to D–W or Amana or any other Amana distributor that it would carry a full line of Amana ovens and offer the same services that Amana distributors and dealers offered.

SMC was attempting to enter the Amana distribution chain in accordance with its own marketing strategy rather than the marketing strategy that Amana imposed upon its distributors and dealers. SMC was attempting to market one model of Amana's countertop microwave ovens at a low price without any accompanying services. Amana and its authorized distributors and dealers, however, were marketing a differ-

---

11. We recognize that the district court's factual finding, that except for the refusal by D–W all refusals to sell to SMC occurred after January 1, 1978, was clearly erroneous especially in viewing the evidence in a light most favorable to SMC. The record indicates that several refusals to sell occurred in the summer of 1977. However, we find this error to be harmless.

ent product. They marketed the sale of Amana ovens on the basis of price plus consumer services. Absent evidence that SMC attempted and was prevented from marketing this Amana product, SMC cannot establish an illegal group boycott. In this case, SMC did not attempt to market the Amana product.

In *Com-Tel, Inc. v. Dukane Corp.*, 669 F.2d 404 (6th Cir. 1982), this Court found that the considerations in *Sylvania* which required the application of the rule of reason, were that the restrictions were imposed on the entire distribution system by the manufacturer to combat the free rider problem. The restrictions thereby avoided the presumption of illegality because "they had the potential to strengthen the entire distribution chain for Sylvania products and promote the ability of Sylvania products to compete with other television brands." *Id.* at 410. This Court distinguished *Dukane* on the basis that "Dukane did not adopt a general marketing policy to restrict its distributors to certain sales territories and did not, as did Sylvania, restrict distributors to certain locations." *Id.* at 410–411. Thus, the restrictions imposed in *Dukane* were not consistent with Dukane's market strategy. In the present case, SMC has failed to demonstrate that Amana's restrictions were inconsistent with its general marketing strategy. Indeed, the record indicates that the

imposed restrictions were the anchor for its whole marketing strategy. The vertical restrictions necessarily reduced intrabrand competition, but they also had the potential to promote interbrand competition via efficiencies in the distribution of the Amana product. *Oreck v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir. 1978) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978), *aff'd* 639 F.2d 75 (2nd Cir. 1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981).

From the very start of Amana's marketing its countertop microwave ovens, or at least since 1975, Amana required of its distributors and authorized dealers that they provide an acceptable level of required presale, point-of-sale and post-sale services. Consistent with this marketing strategy was Amana's need to eliminate any free riders from its distribution chain. The restrictions were imposed to increase interbrand competition within the microwave oven industry.[12]

In *Sylvania, supra*, the Court refused to impose a per se rule on vertical restraints that displayed a potential for increased interbrand competition. *Cf. United States v. Koppers Co., Inc.*, 652 F.2d 290, 296, (2d Cir.), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981); *See also, Cernuto, Inc. v. United Cabinet Corp.*, 595 F.2d 164 (3d Cir. 1979).[13] Given Amana's demon-

**12.** In *Continental T.V., Inc. v. GTE Sylvania, Inc., supra*, at 55, 97 S.Ct. at 2560, the Court stated that, "[e]stablished manufacturers can use [restrictions] to induce retailers to engage in promotional activities or to provide service and repair facilities necessary to the efficient marketing of their products. Service and repair are vital for many products, such as automobiles and major household appliances. The availability and quality of such services affect a manufacturer's goodwill and the competitiveness of his product. Because of market imperfections such as the so-called "free rider" effect, these services might not be provided by retailers in a purely competitive situation, despite the fact that each retailer's benefit would be greater if all provided the services than if none did."

**13.** In *Cernuto* the court stated in reversing a summary judgment disposition:

Given the alleged anticompetitive and arguably horizontal impact of United's decision,

and given the price orientation of the alleged conspiracy, we cannot say that a per se violation of the Act may not be shown.... Of course, at trial the defendants may be able to demonstrate that the evidence does not at all conform to what the plaintiff has alleged. If it could be shown, for example, that United's decision to terminate Cernuto was in fact its own—the result of its own marketing strategy and judgment—then notwithstanding Famous' actions, the alleged conduct would be ·essentially unilateral in nature and might be found to possess the procompetitive redeeming virtues that would defeat the application of a per se rule. Similarly, if defendants can demonstrate that their actions were not motivated *solely* by consideration of price then the use of a per se rule might be inappropriate.

*Id.* at 170. (emphasis added). In the present case Amana does demonstrate that its actions in imposing restrictions were not solely moti-

stration of the need to eliminate the free rider problem within its chain of distribution in order to be more efficient and thereby more competitive, as well as the lack of evidence to support a finding that Amana imposed restrictions due to the demands and coercion of its distributors or dealers, we agree with the district court that Amana's vertical restraints are not the kind that facially appear to be the type that would always, or almost always, tend to restrict competition. Amana's demonstration of potential pro-competitive effects is clear and any demonstration that Amana's actions were the result of horizontal concerted action is lacking.

### B.

■ SMC also asserts that the district court erred in granting Amana and D–W's motion for summary judgment dismissing its claims of per se illegal horizontal market divisions and price stabilization. For the same reasons that are applicable to SMC's group boycott claim we agree with the district court that these claims also must be analyzed under the rule of reason. We agree with the district court that there is no evidence of agreements between distributors or dealers to allocate markets. *United States v. Topco Assocs., Inc.,* 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). Further, there is no evidence to support a finding of concerted action between Amana and its distributors or dealers for the purpose or with the effect of stabilizing the price of Amana microwave Radarange ovens. *United States v. Socony-Vacuum Oil Co.,* 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). Amana's restrictions do not interfere with the setting of price by market forces but do require its distributors and dealers to sell the same product.

Although the parties do not label this case as involving a dual distributorship, SMC does point out that Amana is repre-

sented at the manufacturing level and at the distributorship level.[14] Several cases, however, dealing with the dual distributorship situation apply the same analysis applied above to determine whether restrictions imposed by a dual distributor should be analyzed under a per se rule. *Krehl v. Baskin-Robbins Ice Cream Co.,* 664 F.2d 1348 (9th Cir. 1982); *Copy-Data Sys., Inc. v. Toshiba America, Inc.,* 663 F.2d 405 (2d Cir. 1981); *United States v. Koppers Co., Inc.,* 652 F.2d 290 (2nd Cir.), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981); *Abadir & Co. v. First Mississippi Corp.,* 651 F.2d 422 (5th Cir. 1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 119 (1981).

In the present case, several potential economic advantages are legitimately advanced by Amana for imposing horizontal market divisions: attracting aggressive retailers, inducing retailers to engage in promotional activities, creating an efficient market distribution system, and maintaining control over the safety and quality of the product. In *Abadir & Co. v. First Mississippi Corp., supra,* the Fifth Circuit states:

> A *per se* rule is applicable to a particular case if and only if the economic analysis which justifies the rule applies to the particular case. The *per se* horizontal market-distribution rule would be applicable to the agreement between First Mississippi and Abadir if and only if the economic analysis justifying the *per se* rule applied to the relationship between First Mississippi and Abadir. Because the potential economic advantages which might have motivated First Mississippi are those characteristic of a vertical rather than a horizontal market-distributing agreement, the *per se* horizontal rule does not apply.

vated by consideration of price. Amana demonstrates that in order to market its product plus services so that it can present a more competitive product interbrand, free riders must be eliminated intrabrand.

14. A dual distributorship involves a business structure in which one party operates a branch of dealership on the same market level as one or more of its customers. In this case Amana operated several distributorship stores on the same level as D–W.

*Id.* at 426. Reviewing the evidence in this case in a light most favorable to SMC, we agree with the district court that Amana's restrictions cannot be characterized as horizontal—facially appearing to be the type of restrictions that would always or almost always tend to restrict competition and decrease output. *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 20, 99 S.Ct. 1551, 1562, 60 L.Ed.2d 1 (1979). We find, therefore, that this case was appropriately submitted to the jury under the rule of reason for a determination of whether the restraints imposed increased competition or whether they were such as to suppress or even destroy competition. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed. 568 (1977).

## V.

SMC also contends that in submitting this case to the jury the district court erred in instructing the jury under the rule of reason. We do not agree.

The district court instructed the jury concerning the rule of reason in part as follows:

> However, in determining reasonableness there are three crucial inquiries you must make. First, you must determine whether Amana has substantial market power to unreasonably restrain trade in the relevant market. Second, you must determine the effect of the restrictions on competition. Third, you must consider the justifications for imposing the restrictions.

SMC asserts that anticompetitive effect on intrabrand competition alone is sufficient to establish a section 1 violation so that the requirement of substantial market power is not proper. SMC also asserts that the Court's instruction allowed the jury to find an unreasonable restraint and then consider any justifications rather than simply looking to the effect of such restrictions. Finally SMC contends that the district court improperly failed to instruct the jury that the restraints violated section 1 if the purpose of the restraint was to stabilize prices.

Rule of reason analysis requires a showing of anti-competitive market effect by the plaintiff. *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 268 (7th Cir. 1981); *Borger v. Yamaha Int'l Corp.*, 625 F.2d 390, 397 (2d Cir. 1980); *Cowley v. Braden Indus., Inc.*, 613 F.2d 751 (9th Cir.), *cert. denied*, 446 U.S. 965, 100 S.Ct. 2942, 64 L.Ed.2d 824 (1980); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 386–89 (9th Cir. 1978), *cert. denied*, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); *H & B Equip. Co. v. Int'l Harvester Co.*, 577 F.2d 239, 246 (5th Cir. 1978). Without market power, a firm cannot have an adverse effect on competition. *Donald E. Rice Tire Co. v. Michelin Tire Corp.*, 483 F.Supp. 750, 761 (D.Md.1980), *aff'd*, 638 F.2d 15 (4th Cir.), *cert. denied*, 454 U.S. 864, 102 S.Ct. 324, 70 L.Ed.2d 164 (1981). In *Oreck v. Whirlpool Corp.*, 579 F.2d 126 (2d Cir. 1978) (en banc), *cert. denied*, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1979), *aff'd* 639 F.2d 75 (2d Cir. 1980), *cert. denied*, 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981), the court stated:

> In order to prove a violation of § 1 of the Sherman Act, Oreck would have had to show that Whirlpool's agreement with Sears to eliminate Oreck's competition either promoted a Whirlpool monopoly in the vacuum cleaner industry . . . or gave Sears a market position from which it could raise retail prices even in the face of interbrand competition.

*Id.* at 130 n.5. As pointed out by the court in *Sylvania, supra*, rigorous competition among dealers in different brands provides a significant check on the exploitation of the intrabrand market power. *See also, Muenster Butane, Inc. v. The Stewart Co.*, 651 F.2d 292, 297 (5th Cir. 1981). The district court, therefore, properly instructed the jury to consider Amana's market power.

Similarly, the district court's instruction regarding justifications for imposing restrictions was not erroneous. In evaluating an agreement's competitive *effect*, the jury must consider "the facts peculiar to the business, the history of the restraint, and the reasons why it was imposed." *National Soc'y of Professional Eng'rs v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355,

1365, 55 L.Ed.2d 637 (1978); *Chicago Bd. of Trade v. United States*, 246 U.S. 231, 238, 38 S.Ct. 242, 243, 62 L.Ed. 683 (1918).

Finally, we find no merit in SMC's argument that the district court erred in failing to instruct the jury that an unlawful intent to stabilize prices is sufficient to establish a rule of reason violation. The test under the rule of reason of a restraint's reasonableness is whether such restraint has an anticompetitive or procompetitive *effect*.

## VI.

SMC also contends that the district court erred in refusing to admit evidence of price differentials prepared by Amana to confirm SMC's own price differential reports received by the court. The price differential report prepared by Amana was obtained by SMC during discovery but was not relied upon by Amana or Amana's expert during the course of trial. Inasmuch as the excluded evidence was cumulative we find that no substantial right was affected and that the district court did not err in excluding it. *Fed.R.Evid.* 403.

## VII.

Accordingly, the judgment of the district court is AFFIRMED.